**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
JOHN DOE,                                          |
                                                   |        **Case No.**  6:22-CV-0214 (DNH/ATB)
                          **Plaintiff,**           |
                                                   |
    -   **against -**                              |
                                                   |
**TRUSTEES OF HAMILTON COLLEGE,**                  |
                                                   |
                          **Defendant.**           |
-------------------------------------------------------------x

## COMPLAINT AND JURY DEMAND

Plaintiff John Doe (a pseudonym),[1] by his attorneys Nesenoff & Miltenberg LLP, as and

for his Complaint against Defendant Trustees of Hamilton College, respectfully alleges as

follows:

## THE NATURE OF THIS ACTION

1.      Plaintiff John Doe ("John Doe") was a sophomore undergraduate student at

Trustees of Hamilton College ("Hamilton") when he was erroneously found responsible for

non-consensual sexual contact (kissing and touching outside clothes) allegedly occurring during

the first semester of his freshman year and wrongly expelled.

2.      For the 2020-2021 school year, John Doe and Jane Roe were both freshmen and

were friends at Hamilton. One night in early October 2020, John Doe went to a gathering of

Hamilton students on a dorm floor.  John Doe spoke with Jane Roe, but no sexual interaction

occurred other than a couple of consensual short pecks on the lips.  Nevertheless, Jane Roe

subsequently lied and falsely accused John Doe of touching Jane Roe's private body parts over

her clothing and kissing her without her consent in a dorm room and in bathroom on a dorm

_____
[1] Plaintiff John Doe has filed herewith a motion to proceed by pseudonym with respect to both
John Doe and Jane Roe.

floor and also of grabbing her and hugging her without her consent near the basketball courts next to Babbitt Pavilion.   John Doe strenuously denied the accusations throughout the disciplinary proceeding.   Jane Roe's accusations were investigated, and at the time of the hearing, there were no first-hand witnesses corroborating Jane Roe's accusations. But it did not matter. John Doe's university appeal aptly described the hearing before biased hearing officers as a "lynching," the product of an overtly biased hearing panel chair who, having an antipathy to a male Hispanic football player, acted as if in a Star Chamber, ruling irrelevant and excluding what was in fact highly relevant evidence contradicting Jane Roe's story; the hearing panel disregarded in fact the burden of proof when adopting a false narrative and disregarded all the inconsistencies in testimony with respect to and lack of support for Jane Roe's accusations, being guided by a victim-centered, trauma-informed, believe the woman mentality; and based upon the false narrative, John Doe was erroneously found responsible for non-consensual sexual contact for the alleged conduct in a dorm room and bathroom (but not near the basketball courts) and was given an insanely disproportionate sanction of expulsion, which is shocking to one's conscience.   Hamilton's expulsion was premised upon a purported lack of confidence in John Doe's capability of adhering to Hamilton's community standards, which was not rationally based upon the evidence and which reflected the destructive anti-male mindset at Hamilton.

3.      John Doe now brings this action for Title IX sex discrimination and related state law claims to remedy the unjustly inflicted damage to his education and his hopes and dreams from Hamilton's flagrantly discriminatory actions.

## **THE PARTIES**

4.      Plaintiff is a Hispanic-American male, citizen of the United States, and a current resident of the State of New York. During the events described herein, Plaintiff was a student on

a full-ride scholarship at Hamilton and a member of the Hamilton football team, and he resided on Hamilton's campus in Clinton, New York.

5.     Hamilton is a private, liberal arts college, originally founded in 1793, with an undergraduate student enrollment of approximately 1,850 students (approximately 54% female and 46% male), with an address of 198 College Hill Road, Clinton, New York 13323.  Hamilton has been receiving federal funding.

<strong><u>JURISDICTION AND VENUE</u></strong>

6.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, § 1343, and § 1367 because: (i) the federal law claim arises under a statute of the United States; (ii) the federal law claim arises under federal civil rights law, and (iii) the state law claims are so closely related to the federal law claim as to form the same case or controversy under Article III of the United States Constitution.

7.     This Court has personal jurisdiction over Hamilton on the grounds that Hamilton is conducting business within the State of New York, is a resident of the State of New York and whose actions that are the subject of this action took place in the Northern District of New York.

8.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Hamilton is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

<strong><u>FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION</u></strong>

A.     <u>Title IX and the Governing Title IX Regulations.</u>

9.     Title IX of the Education Amendments Act of 1972 provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be

[3]

denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

10.     Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities.  Hamilton is a recipient of federal funds and is therefore bound by Title IX and its regulations.

11.     Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, for example, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of an activity such as school sports.

12.     On May 6, 2020, then Secretary Betsy DeVos announced that, after a rule-making process conducted pursuant to the Administrative Procedure Act, new Title IX regulations would go into effect on August 14, 2020.

13.     The Title IX regulations effective August 14, 2020 (and thus applicable in this case) state that the university or college disciplinary process shall treat complainants and respondents equitably, objectively evaluate the evidence, not have conflicts of interest or bias, presume respondents are not responsible, have prompt time frames, identify the burden of proof that is to be applied uniformly and have support services for both complainants and respondents. 34 C.F.R. 106.45(b)(1).

14.     The Title IX regulations effective August 14, 2020 (and thus applicable in this case), require formal written notice of allegations that contains "sufficient details known at the time and with sufficient time to prepare a response before any initial interview" – "[s]ufficient details include the identities of the parties involved in the incident, if known, the conduct allegedly constituting sexual harassment, and the date and location of the alleged incident, if

[4]

known." 34 C.F.R. 106.45(b)(2). That written notice "must include a statement that the respondent is presumed not responsible for the alleged conduct" and must be amended if additional allegations are made later in the proceeding. 34 C.F.R. 106.45(b)(2).

15.     The Title IX regulations effective August 14, 2020 (and thus applicable in this case), require that the university or college conduct investigations that:

(i)     "Ensure that the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rest on the recipient and not on the parties," 34 C.F.R. 106.45(b)(5)(i);

(ii)    "Provide an equal opportunity for the parties to present witnesses, including fact and expert witnesses, and other inculpatory and exculpatory evidence," 34 C.F.R. 106.45(b)(5)(i);

(iii)   "Not restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence," 34 C.F.R. 106.45(b)(5)(iii);

(iv)    "Provide the parties with the same opportunities to have others present during any grievance proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice, who may be, but is not required to be, an attorney," 34 C.F.R. 106.45(b)(5)(iv);

(v)     "Provide, to a party whose participation is invited or expected, written notice of the date, time, location, participants, and purpose of all hearings, investigative interviews, or other meetings, with sufficient time for the party to prepare to participate," 34 C.F.R. 106.45(b)(5)(v);

(vi)    "Provide both parties an equal opportunity to inspect and review any evidence

[5]

obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient [university or college] does not intend to rely in reaching a determination regarding responsibility and inculpatory or exculpatory evidence whether obtained from a party or other source" and "[p]rior to completion of the investigative report, the recipient [university or college] must send to each party and the party's advisor, if any, the evidence subject to inspection and review in an electronic format or a hard copy, and the parties must have at least 10 days to submit a written response, which the investigator will consider prior to completion of the investigative report," 34 C.F.R. 106.45(b)(5)(vi);   and

(vii)   "[c]reate an investigative report that fairly summarizes relevant evidence and, at least 10 days prior to a hearing . . . send to each party and the party's advisor, if any, the investigative report in an electronic format or a hard copy, for their review and written response," 34 C.F.R. 106.45(b)(5)(vii).

**B.**   __The Relationship of John Doe and Jane Roe.__

16.   John Doe and Jane Roe met via social media in March 2020 before they would commence college at Hamilton in late August 2020.  John Doe and Jane Roe were both part of the incoming freshman class at Hamilton scheduled to start school in late August 2020, and the social media connection was in that context.  From March 2020 to August 2020, John Doe and Jane Roe communicated with some regularity on social media.  On one occasion, on April 3, 2020, Jane Roe sent a picture of herself wearing only a bra and panties to John Doe.

17.   After school at Hamilton started for the 2020-2021 school year, John Doe and Jane Roe on campus had fewer communications.  During the fall of 2020, John Doe lived in

Major Hall, and Jane Roe lived in Wallace Johnson Hall.  John Doe and Jane Roe did run into each other on campus with their respective friends in outdoor spaces which was required because of Covid restrictions.

**C.      The Night of Friday, October 2, 2020.**

18.      On October 2, 2020, Jane Roe had plans to go to North Hall at 9:00 pm to meet friends who lived there and then to Dunham Hall to meet up with other friends who lived there and then on to the basketball courts near Babbitt Pavilion.  Independently, on October 2, 2020, John Doe had plans to go to North Hall to visit friends.

19.      At some point before 8:00 pm that evening of October 2, John Doe messaged Jane Roe asking her what her plans were for the evening.  Jane Roe responded that she was going to hang with her teammates and would let him know if she (Jane Roe) were around.  At around 8:00 pm, Jane Roe went to her neighbor's room and had two drinks there of mixture of vodka and an energy drink ("Monster").  When Jane Roe left her dorm (Wallace Johnson) to head to North Hall, she carried with her a water bottle filled with an inch of vodka and Monster energy drink.  Meanwhile, before leaving his dorm room, John Doe took one shot of tequila, did not feel any effects from it, and used a Gatorade sports bottle to mix another shot of tequila with orange juice and raspberry juice, which he took with him to North Hall.  John Doe, on his way to North Hall, messaged Leah Basel to ask her what her plans were for the night, and Leah Basel responded that she was hanging out on her floor with friends playing sex bingo.

20.      When Jane Roe arrived at North Hall, one of her friends let her in, and Jane Roe proceeded to the fourth floor and Meghan Lane's room, Room 401.  Jane Roe noticed that North Hall residents in the hallway were setting up to play sex bingo, a campus-wide event organized by Rachel Brimmer, the Resident Advisor for the fourth floor of North Hall.  In Room 401, Jane

Roe hung out with Meghan Lane, Casey Fiore and Abby Smith, who were drinking while in North Hall.  Meghan Lane and Abby Smith went in and out of Room 401 while Jane Roe was there. Meanwhile, when John Doe arrived at North Hall, he went to the first floor and hung out with friends for about ten minutes and then went up to the fourth floor in North Hall.   On the fourth floor, John Doe had brief exchange with Leah Basel and Maeve Harrington. Many of the girls said that in their opinion, John Doe was not intoxicated.

21.     At around 9:20 pm, Casey Fiore walked out of Room 401 and Jane Roe stood in the open doorway.  John Doe, who was sitting in the hallway, recognized Jane Roe, who waived at John Doe.  John Doe walked over to and entered Room 401.

22.     At this point, the unsworn testimony of John Doe and Jane Doe dramatically diverged.  According to John Doe, there were no physical interactions between John Doe and Jane Roe in Room 401.  According to Jane Roe, the first time that John Doe was in Room 401, he put his hands on her waist and touched her shoulder and her hair, which Jane Roe said made her feel uncomfortable and to tell John Doe she was intoxicated, and John Doe left after being asked to leave the room by Meghan Lane due to Covid concerns.  According to Jane Roe, Meghan Lane then left her room and did so leaving it unlocked with Jane Roe still in it, Jane Roe tried on a shirt of Meghan Lane's, at which time Jane Roe was only wearing a bra when John Doe walked back into the room.  According to Jane Roe, John Doe proceeded to hug her from behind, cupped her breasts over her clothes, slide his hands down to squeeze her buttocks and bite her own an ear, at which time Jane Roe turned around but before Jane Roe could express displeasure, John Doe kissed her without Jane Roe's consent.  According to Jane Roe, after John Doe left the room again, Jane Roe asked Casey Fiore if she saw John Doe kiss her, but Casey Fiore did not meaningfully respond. John Doe steadfastly denied all the accusations involving

[8]

physical interactions with Jane Roe.  Meaghan Lane testified that Jane Roe tried on any of shirts that night, and Casey Fiore, who was in the room at the time, testified that this never happened.

23.      According to Jane Roe, she left Room 401 and went to the bathroom on the floor and entered a toilet stall, John Doe followed her in the bathroom saying he knew she was in there and when Jane Roe left the toilet stall, she asked John Doe what he was doing there.  According to Jane Roe, when she stood in front of sink, John Doe walked up behind her and grabbed her buttocks over her clothes and then grabbed her by the hips and pushed her against the hallway, pinning her with his pelvis, rubbing his hand on her vagina area over her clothes and trying to unbutton her jeans.  According to Jane Roe, no one was in the bathroom to witness to these events, although Abby Smith started to enter the bathroom but pulled back, after which Abby Smith saw Jane Roe and John Doe separately leave the bathroom.  According to John Doe, Jane Roe's female seduction fantasy of a story did not happen and was a false accusation.  He had independently gone to the bathroom, used it, and then he and Jane Doe engaged in kissing until Abby Smith attempted to enter the bathroom.

24.      Jane Roe made a show that night of being upset and talked with her friends about being inappropriately touched and that she just could not get away from John Doe.  Abby Smith and Meghan Lane talked to the Resident Advisor Rachel Brimmer sometime between 10:00 pm and 10:30 pm about Jane Roe being distraught and having been unwillingly touched by someone.  Rachel Brimmer had been running the sex bingo event.  Jane Roe then went to Rachel Brimmer's room and told Rachael Brimmer that John Doe had inappropriately touched her in Meghan Lane's room and had kissed her in the bathroom without her consent and that she (Jane Roe) was intoxicated.  According to Rachel Brimmer, Abby Smith and Meghan Lane filled in

[9]

the gaps when Jane Roe could not remember, even though Abby Smith and Meghan Lane were not witnesses to anything.

25.     Both John Doe and Jane Roe went to the basketball courts next to Babbitt Pavilion, with John Doe arriving first.  Prior to Jane Doe arriving at the basketball courts, John Doe sent two messages to Jane Roe inviting her to the rugby fields near the basketball courts. When John Doe approached Jane Roe's friends at the basketball courts, they would not speak to him.  John Doe inferred that they and Jane Roe were upset with him.  John Doe then sent a series of text messages to Jane Roe, saying he was truly sorry, blaming it on being intoxicated but without saying what he was sorry for.  John Roe in fact was not intoxicated and did not know what had caused the apparent rupture with Jane Roe, but he was anxious to preserve a friendship.

26.     Jane Roe, after being at the basketball courts ten to fifteen minutes, went over to John Doe and talked with him. According to Jane Roe, she told John Doe to stop texting her, but John Doe apologized repeatedly, teased her about snot on her face and then gave her a hug and put his hands on her face, after which Jane Roe said she wanted to go back to her friends. According to John Doe, Jane Roe came over to him at the basketball courts and he apologized, but he did not put his hands on Jane Roe's face.

27.     The next day, October 3, 2020, John Doe twice texted Jane Roe that they needed to talk and he apologized if he made her feel uncomfortable in any way.  Jane Roe texted back that she would rather not speak with John Doe.

**D.    Jane Roe's November 2020 Complaint and the**
       **November 2020-June 2021 Hamilton Investigation.**

28.     Over one month later, on or about November 11, 2020, Jane Doe made a Formal Complaint, alleging that on October 2, 2020: (i) in Room 401 of North Hall, John Doe touched Jane Roe's private parts "against her will when he grabbed Jane Roe's buttocks and/or vagina

(through clothing) and that John Doe kissed Jane Roe, "hugged her and/or bit her ear without her affirmative consent"; (ii) in the fourth-floor bathroom of North Hall, John Doe touched Jane Roe's private parts "against her will when he grabbed Jane Roe's buttocks, breasts and/or vagina (through clothing) and John Doe kissed Jane Roe "without her affirmative consent"; and (iii) near the basketball courts next to Babbitt Pavilion, John Doe "engaged in unwelcome conduct of a sexual nature when he grabbed her wrists, pulled here away from the group of gathered students, repeatedly hugger her, and refused to let her go when she asked him to do so." Hamilton treated the allegations of Jane Roe's Formal Complaint concerning what happened in North Hall Room 401 and fourth floor bathroom as constituting Title IX Non-Consensual Sexual Contact and Non-Title IX Non-Consensual Sexual Contact and the allegations of Jane Roe's Formal Complaint concerning what happened near the basketball courts next to Babbitt Pavilion as constituting Non-Title IX Non-Consensual Sexual Contact.

29.    On November 11, 2020, Hamilton sent a Notice of Formal Complaint to John Doe.  The Notice of Formal Complaint informed John Doe that Jane Roe had brought a Formal Complaint with the following allegations: (i) Title IX Non-Consensual Sexual Contact in North Hall Room 401 (touched Jane Roe's body parts without her consent when grabbed her buttocks through clothing); (ii) Non-Title IX Non-Consensual Sexual Contact in North Hall Room 401 (kissed Jane Roe, hugged her and bit her ear without consent); (iii) Title IX Non-Consensual Sexual Contact in North Hall 4th floor bathroom (touched her private parts without consent when "grabbed her buttocks, breasts, and/or vagina" through clothing and pressed his erect penis against her buttocks through clothing); (iv) Non-Title IX Non-Consensual Sexual Contact in North Hall 4th floor bathroom (kissed Jane Roe without consent); (v) Non-Title IX Non-Consensual Sexual Contact near basketball courts next to Babbitt Pavilion (unwelcome conduct

of a sexual nature hen gabbed her wrists, pulled away from group of students and repeatedly hugged her).  Jane Roe's written complaint was attached to the Notice of Formal Complaint. John Doe was also informed that the investigation would be conducted by an outside investigator, an attorney with the Cozen O'Connor law firm.

30.     Also on November 11, 2020, Hamilton assigned an Advisor to Jane Roe.  On November 16, 2020, Hamilton's investigator reached out to Jane Roe.  On November 18, 2020, Hamilton's investigator interviewed Jane Roe; and on November 23, 2020, Jane Roe provided what Hamilton called evidence.

31.     On November 25, 2020, Hamilton's investigator reached out to John Doe before Hamilton assigned an Advisor to John Doe, which did not occur until November 29, 2020.  On December 7, 2021, John Doe provided what Hamilton called evidence, and on December 21, 2020, John Doe provided audio recordings.  But John Doe was not interviewed until December 21, 2020.

32.     From December 1, 2020, to January 23, 2021, Hamilton's investigator interviewed fourteen other students, eleven of whom were females, including Meghan Lane, Abby Smith, Rachel Brimmer, Casey Fiore, Leah Basel, Chole Chiota, Oliva Chiota, and Maeve Harrington.  The accounts from the interviews of these eleven females did not match Jane Roe's story and did not align with each other, there were substantial changes in their versions and many deletions of what they had stated initially to the investigator.

33.     On March 19, 2021, Hamilton's investigator made available an initial investigation report to John Doe and Jane Roe; John Doe and Jane Roe were not allowed to retain copies.  On March 30, 2021, John Doe and Jane Roe submitted their respective responses. In April 2021, Hamilton's investigator met with John Doe about his response, which included

materials that Hamilton's investigator "concluded" were irrelevant but which were in fact highly relevant.  On May 25, 2021, Hamilton's investigator made available an updated investigation report to John Doe and Jane Roe; again, John Doe and Jane Roe were not allowed to retain copies.  On May 28, 2021, Jane Roe submitted a response to the updated investigation report; John Doe's response, however, was said to be not available.

34.     The investigation report was a contrived attempt to give credibility to Jane Roe's story and accusations of non-consensual sexual touching and to cast doubt on John Doe's account and denials of accusations of non-consensual sexual touching.  This was not the result of "investigation" into the facts, but of a pre-determined narrative to believe the female's accusations.

35.     On June 10, 2021, Notice of Hearing was sent to the parties.  On June 22, 2021, the final investigation report was delivered to Hamilton's Title IX Coordinator.

**E.      The Sham Hearing: Hearing Panel Chair's Overtly Biased Prosecutorial Behavior.**

36.     For the Hearing, on June 20, 2021, Catherine Berryman initially appointed Ms. Bryn Lovejoy-Grinnell as the Chair of the Panel. Ms. Lovejoy-Grinnell has been an advocate for victims of sexual abuse for the majority of her life. Despite this clear appearance of bias, Ms. Berryman denied John Doe's request to have her recused, and it was only after a week of written submissions that Ms. Berryman finally relented, appointing instead Julia E. Green, a self-identified member of the LGBT community, in Ms. Lovejoy-Grinnell's place.  Julia E. Green was known as being hostile to male heterosexual athletes such as John Doe. This appointment set up the Hearing to be a sham hearing, in effect, a lynching designed to make an example of John Doe following Hamilton's revisions of its procedures to make it appear that Hamilton was complying with the Title IX regulations that went into effect on August 14, 2020 and described

in paragraphs 13-15 above. The form of a hearing was provided, but a real hearing was not Additionally, if John Doe were expelled, it would enable Hamilton to rid themselves of a scholarship and, in the alternative, accept a paying student.

37.     Hearing Panel Chair Julia E. Green's bias was manifested in numerous ways during the sham hearing.

38.     Hearing Panel Chair Julia E. Green conducted herself as if she was a prosecutor against John Doe. Whenever one of Jane Roe's thirteen witnesses would testify, she would give them open-ended questions to answer and correct them if they made a mistake. At no time did she confront them with the inconsistencies which were contained in their various statements to the investigator.

39.     During John Doe's summation, after only ten minutes, Hearing Panel Chair Julia E. Green abruptly directed John Doe to stop and sit down, despite the fact that he had not reached many critical points in the summation. Hearing Panel Chair Green justified the interruption of John Doe's summation by a ten-minute time limit, which she had never advised either John Doe or his advisor of prior to the commencement of John Doe's summation.

40.     Hearing Panel Chair Green allowed improper reputation questions to be asked by Jane Roe's advisor. Although John Doe had only been attending Hamilton for one month at the time of the alleged incident, Hearing Panel Chair Green permitted Jane Roe's advisor to ask the witnesses what John Doe's reputation in the community for truthfulness in order to challenge John Doe's character. When Jane Roe's advisor asked about John Roe's reputation for truthfulness in the community, the witness blurted out that John Doe's reputation was that he had assaulted others, which was false and which was highly prejudicial. The first time the answer was given, Hearing Panel Chair Green did not take immediate action, but rather only after a 30

[14]

minute break, did Hearing Panel Chair Green technically strike the answer and did so again when the same answer.  But despite the answers being technically stricken, they could not be unheard, and Hearing Panel Chair Green did nothing to prevent these false accusations from being made part of the proceeding.  Hearing Panel Chair Green knew that the responses given were likely, given what was contained in the statements provided to the investigator, but she allowed the question about reputation to be asked anyway.

41.     Over John Doe's strenuous objection, Hearing Panel Chair Green ruled that two persons could testify despite neither having been identified prior to the commencement of the hearing. In fact, one of those witnesses did in fact testify. Hearing Panel Chair Green was fully aware, given their interviews with the Hamilton's investigator, that the intent of the two persons was to allege that John Doe had assaulted them and others.

42.     Over John Doe's strenuous objection, Hearing Panel Chair Green permitted another witness who was not even interviewed by the investigator as part of the investigation to testify. Notably, that witness, Ms. Katie Rao, was permitted to testify on the final day of the hearing. In fact, when John Doe's advisor attempted to question Katie Rao why she had only come forward two days before the conclusion of the hearing when she knew about it for approximately one year, John Doe's advisor was directed by Hearing Panel Chair Green to stop asking these type of questions and further instructed, if he asked anything further along those lines, she would end his cross-examination of the witness despite his request to be heard. In this connection, the alleged incident occurred on October 2, 2020, the final investigative report was issued June 22, 2021, and the request for additional witnesses was made by Jane Roe on July 23, 2021, merely four days before the commencement of the hearing. Moreover, Jane Roe's request to admit the

testimony of Katie Rao was made merely two days before the completion of the hearing and the hearing panel was permitted to hear from her on the final day of testimony.

43.     Despite the number of witnesses who had been extensively questioned concerning the level of intoxication of John Doe, Jane Roe and her witnesses, Hearing Panel Chair Green allowed the new witnesses to testify what they observed concerning John Doe's level of intoxication. It was prejudicial: the Hearing Panel would credit Katie Rao's testimony.

**F.     The Sham Hearing: Exclusion of Highly Relevant Evidence.**

44.     Jane Roe's witnesses testified extensively about the trauma she supposedly suffered as a result of the alleged incident on October 2, 2020, Hearing Panel Chair Greene denied John Doe's numerous requests to introduce two tic-toc videos, one taken the very month of the incident showing Jane Roe having a great time, dancing and drinking with her friends. Another video, taken some six (6) months after the incident in question, depicted Jane Roe completely intoxicated, dancing and twerking with her friends. Although these videos were completely probative to refute Jane Roe and her witnesses' testimony concerning the alleged impact Jane Roe supposedly suffered, as a result of the incident of October 2, 2020, Hearing Panel Chair Greene refused to let either of them into evidence. When John Doe's advisor asked to make a record as to the relevancy of these questions, Hearing Panel Chair Greene simply denied the request without any explanation.

45.     Prior to even meeting Jane Roe, having only talked to her over social media, Jane Roe had sent John Doe a very revealing photograph of herself wearing only a bra and panties. Once again, Hearing Panel Chair Greene the Hearing Officer refused to allow this photograph into evidence even though it was highly relevant to show Jane Roe's flirtiness and contradict the alleged incident involving Jane Roe on October 2, 2020.

**G.      The Sham Hearing:  The Record Evidence
        Showed Jane Roe's Accusations Were False.**

46.      The facts concerning these charges were so outlandish that it was obvious they were not true. Starting at the time that John Doe was in Meghan Leone's room with Jane Roe (some of the acts for which John Doe was found responsible for), Jane Roe's witness, Abby Smith, one of Jane Roe's closer friends, testified that as she (Abby Smith) walked in the room, she observed me "being very close to [Jane Roe], grabbing her at the waist." According to Abby Smith, Jane Roe never pulled away, never asked John Doe to stop, nor did she ask for help. Abby testified that "[Jane Roe] was super mature and can certainly handle herself." This was an all-girls floor and all of Jane Roe's friends were present on the floor.

47.      Jane Roe alleged John Doe forced a kiss on her, put his arms around her against her will and bit her ear. However, one of Jane Roe's best friends, Casey Fiore, was in the room the entire time and testified that she thought Jane Roe was fine with everything because, according to her, "if something was wrong, she would have noticed."

48.      At the end of the interaction in the room, Casey posted a snapchat photograph which depicted John Doe with both arms around Jane Roe and Jane Roe smiling ear-to-ear. Jane Roe testified, in an effort to explain away the photograph, that John Doe had snuck up behind her, put his arms around her before she had the time to react, and the Hearing Panel would have the temerity to find that "[Jane Roe] tried to retreat to where Casey was set up to take a selfie on the other side of the room." However, Casey herself testified that before she took the photograph, she waited for John Doe and Jane Roe to get in the picture and only then took the photograph. None of this was mentioned in the Hearing Panel's Decision, which merely parroted what Jane Roe had testified to and disregarded the contradictory evidence.

[17]

49.   Casey also told the investigator and testified at the hearing that "[Jane Roe] had a strong personality and believed that Jane Roe would have asked for help if she needed it." Casey even described Jane Roe's and John Doe's relationship as flirtatious. Casey Fiore also told the investigator and testified at the hearing that "if she was ever in a situation where a girl would be feeling uncomfortable or touched in a way that wasn't welcome," she would know. Finally, Casey also told the investigator and testified at the hearing that what happened in the room didn't faze her. There is no way under these undisputed facts that any fair-minded, unbiased panel could have found John Doe responsible for what happened in Meghan's dorm room.

**H.    The Hearing Report.**

50.    The Hearing Panel report is a false document that reflected a discriminatory believe the woman mentality and that in fact disregarded the preponderance of the evidence evidentiary burden on the school and described the facts according to Jane Roe's narrative despite that narrative being contradicted by Jane Roe's own witnesses and at times was not even supported by Jane Roe's testimony.

51.    The Hearing Panel report claims that Jane Roe was trying on one of Meghan's shirts, when John Doe walked in. While Jane Roe did in fact allege this (before the picture of her smiling was posted), Meghan testified Jane Roe never tried on her shirt and Casey Fiore, who was in the room at the time, testified that this never happened. The Hearing Panel, without any supporting record evidence, found that Jane Roe told John Doe to stop and "get off", sobbing and trying to escape John Doe's grasp. This was entirely fictional. Jane Roe herself testified that she never told John Doe to stop and Casey Fiore, who was in the room the entire time, never saw anything, never heard any requests by Lindsay to stop and certainly, never saw Lindsay sobbing. In fact, Casey Fiore testified that at no time did Jane Roe look uncomfortable in any way. And

clearly, the panel did not know how to explain away the snapchat photograph that showed John Doe with his arms around Jane Roe and Jane Roe smiling ear to ear, so the Hearing Panel simply failed to address it.

52.    Additionally, the Hearing Panel focused on its finding that the conduct occurred forcibly; the Hearing Panel simply ignored the testimony of Maeve Harrington, who observed John Doe and Jane Roe in the bathroom talking face to face and the testimony of Gabrielle Pia, who saw John Doe alone in the bathroom. Indeed, contrary to the evidence adduced at the hearing and contrary to Jane Roe's own testimony, the Hearing Panel found that John Doe had "grabbed her skin." Jane Roe, however, told the investigator and testified at the hearing that, in fact, John Doe never touched her skin.

53.    The Hearing Panel disregarded the testimony of Megan Leone, when it found that Megan Leone locked John Doe out of the room, and John Doe returned, but fails to mention that at the hearing, Megan Leone testified at the hearing that she didn't remember if this had in fact happened. The panel found that Lindsay felt disheveled mentally, so she went to the bathroom to compose herself. However, Casey Fiore testified that she believed nothing was wrong because "[John Doe] and [Jane Roe] left the room together." Of course, none of this was made part of the Hearing Panel's decision.

54.    The Hearing Panel treated Jane Roe as credible, when, in fact, every single one of Jane Roe's witnesses contradicted her. One of Jane Roe's friends waiting outside of North Hall testified that it appeared that none of Jane Roe's friends, Abby, Casey or Meghan had any idea what had happened when they exited North. Conveniently, the Hearing Panel completely ignored Jane Roe's testimony that after leaving the bathroom, she ran into Casey's room, having a panic attack, locked the door and only let someone in after she heard knocking on the door. To the

contrary, Abby Smith testified that they walked into the room together. Incredibly, both Jane Roe and Abby, after testifying that the decision to go to the RA was immediate, omitted a major part of the sequence of events where, prior to going to the RA, they both went outside of the building to go to the basketball courts, and spoke to their friends, before returning to talk to the RA.

55.    The Hearing Panel credited Jane Roe when, in fact, every single one of Jane Roe's witnesses contradicted her.

56.    Additionally, Jane Roe gave conflicting versions of what had occurred which the Hearing Panel chose to ignore. Jane Roe told Abby immediately after she left the bathroom that John Doe "was touching her and forcing a kiss on her." The first thing Jane Roe told the girls when she left the building was "I **think** I got sexually harassed." Jane Roe told Kaitlin Reed and the Dunham girls that "she had been cornered in a bathroom stall and was really restricted and felt extremely trapped and uncomfortable." Jane Roe told Julia Fornasar that she was going to the bathroom and John Doe "came in and forced myself onto her when trying to go to the bathroom." After being asked by John Doe's advisor whether this in the stall, Julia said "yes, in the stall." Olivia Chiota testified that Jane Roe told her she "thinks she got assaulted," and told the investigator "I think it was on the ground." Olivia further told the investigator, "I think he entered her with his hands." When the Hearing Panel asserts in its decision that Jane Roe's testimony was corroborated by her witnesses, it is no wonder they had no choice but to neglect the multiple, inconsistent versions of what Jane Roe had said had occurred.

57.    The Hearing Panel relied heavily on the testimony of Rachel Brimmer, the RA, in arriving at their decision. Indeed, John Doe argued in his summation that she was the most important witness, as she had no motive to lie. However, the Hearing Panel conveniently omitted the fact that Abby and Meghan initially told Ms. Brimmer that they had a friend "who thinks she

had been sexually harassed." The Hearing Panel also neglected to put in its report that both Abby and Jane Roe were not truthful with Ms. Brimmer when Abby told her she walked into the bathroom and saw John Doe choking and pinning Jane Roe against the bathroom wall, and Jane Roe confirmed that is what happened. This statement turned out to be an outright lie.  At the hearing, they both denied this significant event ever occurred. Incredibly, after all of this had allegedly occurred to her, Jane Roe wanted to go out and "have a normal night." The panel changed the testimony when it found at the basketball courts, after Jane Roe walked up to John Doe, that Jane Roe "stood like a limp noodle," when I gave her a hug. In fact, Jane Roe's friend, Chloe Chiota, testified that we "embraced in a **full mutual hug."** The Hearing Panel neglected to address Olivia Chiota's testimony that when she approached John Doe and Jane Roe talking, Jane Roe told her that she was fine.  The Hearing Panel also ignored Olivia Chiota's testimony that when John Doe and Jane Doe were talking, she heard Jane Roe laugh.  The Hearing Panel, contrary to the testimony, found that John Doe's claim that he was being attacked by other students at the basketball courts was not substantiated in the record. One witness specifically testified that before Jane Roe arrived at the basketball courts, John Doe's fellow football team members had learned of the accusations and were talking about it.

## I.     The Wildly Disproportionate Sanction.

58.     Even assuming, *arguendo,* that what Jane Roe claims happened did in fact happen (which it didn't), the sanction imposed of expulsion given the severity of the violation is completely disproportionate to that imposed on fellow students. This is especially true where a scholarship is being taken away and where the student is a Hispanic American.

59.     John Doe's roommate, who was accused of rape and only months before John Doe's hearing found responsible for slapping a student on her unclothed buttocks, was given

merely probation. In John Doe's case, no claim of rape was alleged, no penetration of any type was alleged, nor, in fact, was any touching of Jane Roe's skin alleged.

60.     The Hearing Panel's purported reason set forth for imposing the drastic remedy of expulsion is, in and of itself, implausible. The Hearing Panel report states that "[John Doe] did not reflect any understanding of the seriousness of his misconduct." That was because John Doe never did the acts the Hearing Panel found him responsible for and the panel failed to note that John Doe offered on numerous occasions to take a lie detector test and that John Doe asked if Jane Roe would be willing to do the same, which Jane Roe refused to answer multiple times.

61.     John Doe had no other disciplinary violations while attending Hamilton.  To be expelled solely based on the word of one witness, whose testimony was directly contradicted by other witnesses, is more than a travesty of justice.

## J.     Appeal and Its Denial.

62.     On October 25, 2021, John Doe timely appealed in Hamilton's Title IX process, citing the grounds discussed above: the sham hearing from the Hearing Panel Chair's bias, the exclusion of highly relevant evidence, the falsity of the accusations obvious from the Hearing evidence, the errors of the Hearing Panel decision, and the wildly disproportionate sanction.  The appeal was denied.

## FIRST CAUSE OF ACTION:
## (Violation of Title IX of the Education Amendments of 1972)

63.     John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

## A.     Title IX and Its Application.

64.     20 U.S.C. § 1681(a), provides in relevant part that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

65.     Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, for example, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of an activity such as school sports.

66.     Hamilton has received and continues to receive federal funding and accordingly has maintained a Title IX office as part of the school.

67.     Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault, *Davis v. Monroe Bd. of Education*, 526 U.S. 629 (1999), or by the imposition of university discipline where gender is a motivating factor in the decision to discipline, *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).  In either case, the statute is enforceable through an implied private right of action.

68.     Title IX's non-discrimination provision applies to the recipient Hamilton regardless of whether the school purports to apply Title IX procedures or other procedures in a disciplinary proceeding.  Students discriminated against on the basis of sex by a school's disciplinary measures applied to the student have a claim under Title IX.

**B.**     **Title IX Challenges To University Disciplinary Proceedings.**

69.     Challenges to university disciplinary proceedings for sex discrimination in the Second Circuit generally fall in two categories: (1) "erroneous outcome" cases, in which the claim is that there is substantial reason to doubt that the plaintiff was guilty of the offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement/undue severity" cases, in which the claim asserts that, regardless of the student's

guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender. *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).

70.     An "erroneous outcome" occurred in this case because John Doe was wrongly found responsible for non-consensual sexual behavior and the totality of the circumstances establish gender bias was a motivating factor.  "Selective enforcement/undue severity" occurred in this case because John Doe was expelled in a case that did not remotely warrant expulsion.

71.     In *Menaker v. Hofstra*, 935 F.3d 20, 34 (2d Cir. 2019), the Second Circuit identified "irregularities" that pointed to gender bias:

> [W]e need not define precisely what sort of irregularities meet the standard of "clearly irregular investigative or adjudicative process."  But we note that *Doe v. Columbia* [, 831 F.3d 46, 57 (2d Cir. 2016),] offers some guidance on this issue. For instance, "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias."

72.     The Hearing Panel made a finding that John Doe was responsible for non-consensual sexual contact when that finding required an uncritical acceptance of Jane Roe's account, a disregarding of Jane Roe's own witnesses and the assertion of facts nowhere in the record.  There was a discriminatory "believe the woman" bias evidenced in the Hearing Panel decision.  Further, the irregularities of the overt bias of the Hearing Panel Chair and the exclusion of highly relevant video and photographic evidence acted to protect and promote the complainant Jane Roe's false accusations; and the major discrepancies between what the Hearing Panel report stated and what the record evidence actually showed reflected the effects of gender biased decision-making.

73.     The totality of the circumstances establish that Hamilton discriminated unlawfully under Title IX in reaching the "erroneous outcome."  Hamilton credited false accusations of non-

[24]

consensual sexual misconduct, presumed that those allegations to be true rather than properly applying the preponderance of the evidence standard and required no reasoned consideration of evidence as required by a burden of proof.

74.     In *Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d at 864-866, the Eighth Circuit upheld the Complaint because the disciplinary decision was against the substantial weight of evidence, the sanction did not match the alleged violation, and the university faced external pressure to aggressively pursue complaints against males.  In support of the statement that "External pressure on a university to demonstrate that it acted vigorously in response to complaints by female students may support an inference that a university is biased based on sex, although not necessarily in a particular case," the Eighth Circuit cited a list of cases: *Doe v. Baum*, 903 F.3d 575, 585-86 (6th Cir. 2018), *Doe v. Miami*, 882 F.3d 579, 592-93 (6th Cir. 2018), *Doe v. Columbia*, 831 F.3d 46, 57 (2d Cir. 2016), *Yusuf v. Vassar College*, 35 F.3d 709 715 (2d Cir. 1994), and *Doe v. Purdue*, 928 F.3d 652, 668-669 (7th Cir. 2019).

75.     The 2011 Dear Colleague Letter "provides a backdrop that, when combined with other circumstantial evidence of bias in [a] specific proceeding, gives rise to a plausible claim." *Doe v. Purdue*, 928 F.3d at 669, quoting *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018).

76.     As noted above, the primary focus of the 2011 Dear Colleague Letter was to protect women from sexual misconduct cases.  As also noted above, the 2011 Dear Colleague Letter effectively required, through the threat of cutting off federal funding, colleges and universities, including Hamilton, to adopt disciplinary procedures for sexual misconduct allegations that conformed to the 2011 Dear Colleague Letter.  Notwithstanding the fact that the 2011 Dear Colleague Letter was rescinded in 2017, the 2011 Dear Colleague Letter still has great relevance here because Hamilton continued to apply the procedures of the old regulatory regime

in this case and not in actual practice the new Title IX regime reflected in the Title IX regulations that went into effect starting August 14, 2020.

77.     Hamilton has created a victim-centered process in which an accused male student is prosecuted under a presumption of guilt, improperly placing the burden of proof on the male respondent in many cases. This one-sided process has deprived John Doe, as a male student, of the benefits of his education at Hamilton which has exhibited a distinctly consistent pattern of decision-making against a male party and in favor of a female party and evaluates evidence according to gender biased assumptions to reach results finding males "responsible" to achieve "justice" according to "gender identity politics."

78.     Hamilton adopted policies and procedures favoring students who file complaints of sexual misconduct and denying fundamental protections to accused students; Hamilton trains its officials to assume complaints of sexual misconduct are valid; Hamilton provides support services for complainants; Hamilton is aware that almost all persons who file complaints of sexual misconduct are female and almost all of the accused students are males; trauma-informed techniques based on pseudoscience allow authority figures to encourage alleged victims to create exaggerated or false memories; investigators are taught that an alleged victim's inability to recall crucial events and changing stories should not raise doubts about the veracity of an allegation; the phrase "believe all women" means that when a female accuses a male of sexual misconduct, she is a "survivor" and her accusations are presumptively true.  Cases recognize allegations of trauma-investigation techniques give rise to an inference of gender bias.  *Norris v. Univ. of Colorado, Boulder*, 362 F.Supp.3d 1001, 1013 (D. Colo. 2019); *Doe v. Syracuse*, 2019 WL 2021026 (N.D.N.Y. May 8, 2019); *Doe v. Syracuse*, 2020 WL 2513691 (N.D.N.Y. May 15, 2020).

79.     "There is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that [the school] turned a blind eye to such assaults." *Doe v. Purdue*, 928 F.3d at 668, quoting *Doe v. Columbia*, 831 F.3d at 58.

80.     The Hearing Officers failed to making clear the role of an advisor and whether or not John Doe or his advisor could cross-examine witnesses and object to evidence and the Hearing Officers' failure for not questioning Jane Doe about her belated accusations.  These failures were part and parcel of Hamilton's conducting the hearing not under the new Title IX regulations that were in effect at the time of Jane Roe's complaint, the investigation, the hearing and the Hearing Officers' decisions.

81.     The anti-male gender biased nature of the sexual misconduct disciplinary proceedings against John Doe was reflected in the failure throughout the process to examine the motives and circumstances of Jane Roe.  One primary reason for that dereliction was anti-male gender bias.

82.     The anti-male gender biased nature of the sexual misconduct disciplinary proceedings against John Doe was reflected in a wildly disproportionate sanction.  John Doe, who had no prior disciplinary history, was expelled.  The disproportionate sanction reflects a gender biased belief that males need to be sanctioned severely for sexual misconduct.  Gruber, *Anti-Rape Culture*, 64 U. Kansas L. Rev. 1027, 1030 (2016).

83.     The Hearing Officers and Appeal Board disregarded the totality of circumstances surrounding John Doe's alleged conduct, among other facts: John Doe had no other disciplinary record; Jane Roe's complaint did not involve rape; there was no evidence supporting a finding of

the use of force; the alleged misconduct occurred as a single, isolated incident; no one other than Jane Roe was affected by what happened the night in question and thus there was no detriment to the health, safety and wellbeing of other members of the Hamilton community.

## A.    Monetary and Injunctive Relief.

84.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, damages to reputation, psychological damages, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

85.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints, ordering the ending of the expulsion, enjoining Hamilton from preventing John Doe doing what is necessary to receive a bachelor's degree from Hamilton and granting clearing of John Doe's transcript of the disciplinary record.

## SECOND CAUSE OF ACTION:
## (State Law Breach of Contract)

86.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

87.    Hamilton created an express and/or implied contract under New York law when John Doe accepted an offer of admission to Hamilton and paid the tuition and fees.

88.    The Introduction to Hamilton's Gender-Based and Sexual Misconduct Policy makes clear that it is intended to be interpreted and applied consistently with Title IX.

89.    Hamilton's Gender-Based and Sexual Misconduct Policy thus intends that students have impartial investigators investigate the case, impartial hearing officers hear the case,

and a fair and impartial disciplinary process in which it is the responsibility of Hamilton to prove by a preponderance of the evidence that a violation has occurred before any sanctions are imposed. Hamilton breached its contract with John Doe when it failed to have impartial investigators and hearing officers to conduct a fair and impartial process that treated John Does and Jane Roes equally and when it failed to adhere to the preponderance of the evidence standard, with presumption of innocence of the respondent, including by not using the proper burden of proof standard, by effectively shifting the burden of proof to John Doe.

90. Based on the aforementioned facts and circumstances, Hamilton breached its express and/or implied contract with John Doe because Hamilton breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe. Hamilton failed its duty of good faith and fair dealing when it committed the procedural and substantive errors complained of above, meted out a disproportionate sanction notwithstanding the flawed process and found John Doe responsible despite the lack of evidence in support of Jane Roe's allegations of sexual misconduct.

91. John Doe is entitled to recover damages for Hamilton's breach of the express and/or implied contractual obligations described above. As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, damages to reputation, psychological damages, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

92. As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**THIRD CAUSE OF ACTION:**
**(State Law Promissory Estoppel)**

93.     John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

94.     Hamilton's various policies constitute representations and promises that Hamilton should have reasonably expected to induce action or forbearance by John Doe.

95.     Hamilton expected or should have expected John Doe to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Hamilton would not tolerate, and John Doe would not suffer, harassment by fellow students and would not deny John Doe his procedural rights should he be accused of a violation of Hamilton Policies.

96.     John Doe relied to his detriment on these express and implied promises and representations made by Hamilton.

97.     Based on the foregoing, Hamilton is liable to John Doe based on estoppel.

98.     As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

**PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, John Doe demands judgment against Hamilton as follows:

(i)     on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Hamilton awarding John Doe:

(a)     an injunction vacating the disciplinary findings and decision with respect to John Doe, ordering the records at Hamilton be amended to

reflect that finding of responsibility against John Doe is reversed or withdrawn, ordering that the sanction of expulsion be reversed and the disciplinary file containing the expulsion be expunged from all records and transcripts, ordering clearing of John Doe's transcript of the disciplinary record, ordering John Doe's undergraduate status be immediately returned to in "Good Standing," and any restrictions imposed upon him removed, and enjoining Hamilton from preventing John Doe doing what is necessary to receive a degree from Hamilton; and

(b)     damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

(ii)     on the second cause of action for state law breach of contract, a judgment against Hamilton awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)     on the third cause of action for state law promissory estoppel, a judgment against Hamilton awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(iv)     awarding John Doe such other and further relief as the Court deems just, equitable and proper.

## <u>JURY DEMAND</u>

Plaintiff John Doe demands a trial by jury of all issues presented herein that are triable by a jury.

**Dated: March 4, 2022**

              **Respectfully submitted,**

              **By: __/s/_ _Philip A. Byler_ _____**

              **Philip A. Byler, Esq.**

              **Andrew T. Miltenberg, Esq.**

              **NESENOFF & MILTENBERG LLP**

              **363 Seventh Avenue, Fifth Floor**

              **New York, New York 10001**

              **(212) 736-4500**

              **pbyler@nmllplaw.com**

              **amiltenberg@nmllplaw.com**

              **Attorneys for Plaintiff John Doe**