UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JOHN DOE,

                              Plaintiff,                          Civil Action No.
                                                                 6:22-CV-0214 (DNH/ATB)

              v.

TRUSTEES OF HAMILTON COLLEGE,

                              Defendant.


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT


BOND, SCHOENECK & KING, PLLC
Attorneys for Defendant
Office and P.O. Address
One Lincoln Center
Syracuse, New York 13202-1355
Telephone: (315) 218-8000

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

PRELIMINARY STATEMENT ............................................................................ 1

FACTUAL BACKGROUND ............................................................................... 2

ARGUMENT ..................................................................................................... 7

POINT I:   TITLE IX DOES NOT PROVIDE FOR A FEDERAL APPELLATE LEVEL OF
REVIEW ............................................................................................................ 7

POINT II:  DOE'S TITLE IX CLAIM MUST BE DISMISSED ................................ 10

   A.   Doe Cannot Reasonably Cast Doubt on the Outcome of the Disciplinary Proceeding . 11

   B.   Hamilton's Determination Was Not Motivated by Gender Bias .................................. 12

       1. Hamilton's Appointment of the Hearing Officer ...................................... 13

       2. Doe's Closing Statement .................................................................... 14

       3. The Exclusion of a Photograph and TikTok Videos ................................ 14

       4. The Testimony of Witnesses ............................................................... 16

       5. Reputation Questions During the Hearing............................................. 17

       6. The Role of an Advisor ...................................................................... 19

       7. The Sanction of Expulsion ................................................................. 20

   C.   Doe's Allegations of Outside Pressure are Speculative ................................. 21

   D.   There is No Pattern of Gender-Biased Decision Making at Hamilton........................... 21

POINT III: DOE'S BREACH OF CONTRACT AND PROMISSORY ESTOPPEL CLAIMS
MUST BE DISMISSED ........................................................................................ 22

CONCLUSION................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Doe v. Colgate Univ.*,
　760 Fed. Appx. 22 (2d Cir. 2019) ...............................................................................10, 11, 21

*Doe v. Colgate Univ.*,
　No. 5:15-CV-1069, 2017 WL 4990629 (N.D.N.Y. Oct. 31, 2017) .........................................11

*Doe v. New York Univ.*,
　438 F.Supp.3d 172 (S.D.N.Y. 2020) ....................................................................................21

*Doe v. Syracuse Univ.*,
　341 F.Supp.3d 125 (N.D.N.Y. 2018) (DNH) .........................................................................23

*Doe v. Syracuse Univ.*,
　457 F.Supp.3d 178 (N.D.N.Y. 2020) (TJM/ATB) .............................................................21, 22

*Doe v. Syracuse Univ.*,
　No. 5:18-cv-377, 2019 WL 2021026 (N.D.N.Y. May 8, 2019) (TJM) ...................................22

*Doe v. Trs. of Boston Coll.*,
　No. 15-cv-10790, 2016 WL 5799297 (D. Mass. Oct. 4, 2016) .............................................11

*Doe v. Vassar Coll.*,
　No. 19-cv-9601, 2019 WL 6222918 (S.D.N.Y. Nov. 21, 2019)..........................................7, 10

*Kant v. Columbia Univ.*,
　No. 08-cv-7476, 2010 WL 807442 (S.D.N.Y. Mar. 9, 2010).................................................24

*Nungesser v. Columbia Univ.*,
　169 F.Supp.3d 353 (S.D.N.Y. 2016)....................................................................................22

*Prasad v. Cornell Univ.*,
　No. 5:15-cv-322, 2016 WL 3212079 (N.D.N.Y. Feb. 24, 2016) (TJM/DEP).........................23

*Routh v. Univ. of Rochester*,
　981 F.Supp.2d 184 (W.D.N.Y. 2013) ..................................................................................22

*Yu v. Vassar Coll.*,
　97 F.Supp.3d 448 (S.D.N.Y. 2015) ............................................................................7, 11, 15

*Yusuf v. Vassar Coll.*,
　35 F.3d 709 (2d Cir. 1994)..........................................................................................7, 10, 11

**Statutes**

New York Education Law Article 129-B, Section 6441 ................................................................15

**Other Authorities**

34 CFR § 106.45(b)(1)(ii)................................................................................................15

34 CFR § 106.45(b)(5)(i).................................................................................................15

34 CFR § 106.45(b)(6)(i)...........................................................................................15, 18

85 Fed. Reg. 30336-37 (May 19, 2020)......................................................................15, 18

85 Fed. Reg. 30353 (May 19, 2020) ...............................................................................15

16730907

## PRELIMINARY STATEMENT

Defendant Trustees of Hamilton College ("Hamilton") submits this memorandum of law in support of its motion for summary judgment. Plaintiff John Doe is a former Hamilton student who was expelled after he violated Hamilton's Sexual Misconduct Policy (the "Policy").

This is not a case about casual intercourse between intoxicated people. At the hearing held in this matter, Complainant Jane Roe described a disturbing series of events:

> The fact [is] that on October 2nd, [John Doe] groped me in [M.L.'s] room and later came into the bathroom while I was there, pinned me to the wall and sexually assaulted me.
>
> ...
>
> There is nothing consensual about being pinned up against a wall with someone holding your neck while they grope you and put their hands down your pants. There was nothing consensual about trying to mentally prepare yourself to be raped.

*Hearing Transcript (Day 1)*, at HC00012268-69.[1]

After an investigation that included interviews of Roe, Doe and fourteen witnesses, and a four-day hearing at which Roe, Doe and sixteen witnesses gave testimony and submitted to cross examination, a Review Panel determined that Doe had violated the Policy and expelled him.

Doe fully participated in the investigation and the hearing. He was represented by an attorney advisor throughout the investigation and the hearing, during which his advisor examined and cross-examined witnesses.

At the end of the process, the Review Panel found Roe's testimony to be consistent, plausible, and corroborated by the testimony of other witnesses and evidence. Doe, on the other hand, was evasive, failed to answer direct questions and provided testimony that was inconsistent with statements he made in text messages to Roe and to the investigator. The Review Panel

---

[1] The transcript of the first day of the hearing before Hamilton's Review Panel is attached to the Declaration of Catherine Berryman as Exhibit L.

carefully weighed all of the evidence and issued a well-reasoned written determination that included a thorough rationale. While Doe may disagree with the Hearing Officer's evidentiary rulings and the outcome of the process, he cannot seek a further level of appeal of those rulings or the outcome through this federal court lawsuit.

The gravamen of Doe's Complaint is that Hamilton expelled him because he is a male that was attending Hamilton on a scholarship. He alleges that Hamilton was facing external pressure to expel males accused of sexual assault and wanted to replace him with a non-scholarship student. Discovery uncovered no admissible, non-conclusory, non-speculative proof that links Hamilton's decisions to gender bias, and there is no pattern of biased disciplinary outcomes at Hamilton.

For these reasons, summary judgment must be granted dismissing Doe's Complaint.

## FACTUAL BACKGROUND[2]

In her interview with the investigator, Roe stated that she met Doe through social media in the Spring of 2020 before their first semester at Hamilton began in the Fall of 2020. In the early days of the Fall 2020 semester, Doe and Roe occasionally ran into each other on campus. *Roe's Interview Transcript*, at HC2262, 67.[3]

Roe told the investigator that on October 2, 2020, she was visiting friends on the fourth floor of the North residence hall. Doe later arrived at North Hall and was let in by a friend who resided on the first floor. Doe made his way up to the all-female fourth floor, where Roe was in M.L.'s room. Almost immediately, Doe's behavior made Roe uncomfortable. Doe hugged Roe

---

[2] The factual background is set forth more fully in Defendant's Statement of Material Facts, which is based on the Complaint, the accompanying Declarations of Catherine Berryman, Julia Green, and Russell Marcus and the exhibits thereto, as well as information provided by Doe during written discovery and his deposition.

[3] A copy of the transcript of Roe's interview with the investigator is appended to the Final Investigation Report, which is attached to the Berryman Declaration as Exhibit F (at HC2253-93).

2

multiple times and touched her shoulder and waist before elevating his advances to cupping her breasts and squeezing her buttocks before biting her ear, grabbing her jaw, and kissing her. *Id.*, at HC2267-71, 73-77.

In an attempt distance herself from Doe, Roe went to the bathroom and entered a stall. Doe entered the bathroom while Roe was in the bathroom stall. Roe told the investigator:

> …So I'm sitting in the stall and I can see him walk up, I can see his shoes under the stall door, and he knocks on the stall and he's like, "I know you're in there [Roe]." So I was like, "Oh shit. This is really, really bad." So I'm sitting in the stall and I'm like, you know what, just play cool, just pretend that nothing's weird, just don't show him that you're scared. Because at this point I was like, as corny as it sounds, at this point I was like, okay, I'm very much like the prey, he's the predator, don't show him that he's affecting you. So I peed, flushed the toilet, left the stall, and I kind of looked at him and I was like, "What are you doing here?"

> Like trying to keep the conversation going and keep it casual, whatever. And I lean over the sink to wash my hands, and he came up behind me, grabbed my butt again, and then he moved his hands up to my chest like he did before. So he went up and grabbed my chest, and he ground his private area against my butt, and I could feel that he was aroused. And so I turned around and I still kept it fairly conversational. I was like, "Stop." Like, "Stop." So I was so in my head thinking, don't show him that you're scared, don't show him that you're freaked out, you just got to get out of the bathroom, get back to [M.L.'s] room, you're fine. You can get back to [M.L.'s] room, you're okay. So I dried my hands with the paper towels and walked out…

> …as I was about to grab the door and walk out, he grabbed my hips and pushed me up against the wall. And that's when things got really bad and I actively was like, "Okay, get off of me. I have to go back to my friends."

> He was kissing me, and I was talking the entire time. He just kept trying to kiss me and I was still talking, I was like, "Get off. I have to go back to my friends. Get off, get off." So he just started touching all over my body with his hands, and I put my hands on his shoulders and tried to push him off me. But he was kind of pinning me. He pushed my arms down and was pinning me against the wall with the rest of his body, like his hip pelvis area, I suppose. He was leaning really hard into me and had my hands down by my side. And I kept trying to shimmy out of it, just get out of it, and I kept saying stop. And then he was, at this point, his hands were under my shirt so he started grabbing skin, and he was rubbing my vaginal area really aggressively through my pants. And that's when I started crying, and he just kept going, kept doing what he was doing and I was crying, and I was saying, "Get off, get off. I have to go."

> And I kept trying to push him off of me, but my hands were pinned. So then he took one of his hands and he put it around my throat and pushed against the wall, and

3

then with his other hand started unbuttoning my jeans and trying to put his hand down my pants. And I was absolutely terrified. I very seriously thought that I was going to get raped in the bathroom and that would be how my night went. And so I was sobbing and trying to get him off of me, but it almost got to the point where I was giving up a little bit. I was kind of like, "All right, well I guess it's going to happen." But I was sobbing and I kept telling him to stop, but in my mind I was losing hope a little bit. And then lo and behold, my friend [AS] opens the door. And we were close enough, I was so close to getting out that, like she opens the door and it hits him and knocks him off of me…then I ran out of the bathroom…

*Roe's Interview Tr.*, at HC2281-82.

During the hearing, Roe testified:

…I initially was kind of trying to push him and he got me to stop pushing him because he pinned me and then kind of stopped grabbing at my chest and my butt and pushed my shoulders back. And then that was when he grabbed my neck with one hand.

And I think that that point I like froze up a little bit because I started thinking like, oh my God, I'm literally about to be raped in this bathroom…at that point, I think I kind of started to give up a little bit because at that point I was like crying and telling him to get off. And if he wasn't doing it at that point, he wasn't going to do it at all. So I kind of started giving up and it was kind of just trying to like mentally prepare myself to, I guess like disassociate or like, I don't know, try not to be there as much as I could…

*Hearing Tr. (Day 1)*, at HC12315-16.  She testified that when Doe's hand was around her neck,

…I started feeling like really lightheaded. I don't know if it was from having been panicking or from pressure on my trachea and not really being able to breathe super well, I don't know if that was because I was so freaked out or…because there was pressure there.

*Id.*, HC12317.

Roe exited the bathroom, immediately reporting the encounter to her friends and then to a resident assistant. *Roe Interview Tr..*, at HC2283.

Shortly after Roe left the bathroom, Doe began sending a series of pleading text messages in which he begged Roe to talk to him, repeatedly apologized and badgered her to agree that he was "not that kind of guy." *Final Investigation Report,* at HC2296-99.

Roe made a formal complaint against Doe under Hamilton's Sexual Misconduct Policy. *Berryman Decl., Ex. C.*  On November 11, 2020, Hamilton's Title IX Coordinator Catherine Berryman met with Doe and provided him with a notice of complaint, which charged him with five violations of the Policy, including two counts of Title IX Non-Consensual Sexual Contact, two counts of Non-Title IX Non-Consensual Contact, and one count of Non-Title IX Sexual Harassment. *Berryman Decl.*, ¶¶ 28-29 and *Ex. D*.

Attorney Michael Stackow was assigned to investigate the allegations of Roe's Complaint and in the course of his investigation, interviewed Roe, Doe and fourteen other witnesses. Doe was accompanied and advised by Attorney Michael Santangelo throughout the investigation.  He was provided the opportunity to identify witnesses, submit evidence, review the transcripts of Roe's interview as well as the interviews of all of the witnesses, review the initial investigation report, provide comments, and submit additional evidence and to review the updated and final investigation reports.  *Berryman Decl.*, ¶¶ 37-49; *see generally Final Investigation Report*.

The parties participated in a four-day hearing at which they and sixteen witnesses testified. *Green Decl.*, ¶¶ 30-35, 43, 51. Attorney Julia E. Green served as the Hearing Officer and a member of the Review Panel that also included Dr. Sally Cockburn and John Geissinger. *Green Decl.*, ¶ 17. Doe's advisor had the opportunity to examine Doe and to cross-examine Roe and each of the witnesses. *Green Decl.*, ¶¶ 33-35, 43-44, 51-52.

After the hearing, the Review Panel deliberated and issued a written determination in which it found Doe responsible for four violations of the Policy, including Title IX Non-Consensual Sexual Contact by touching Roe's private parts in room 401 and the fourth-floor bathroom of North Hall with his hands, and by pressing his erect penis against Roe's buttocks in the bathroom of North Hall without her consent. The Review Panel also found Doe responsible for Non-Title IX

Non-Consensual Contact by hugging, biting, and kissing Roe in Room 401 of North Hall and repeatedly kissing Roe in the fourth-floor bathroom of North Hall, all without her consent. The Review Panel found Doe not responsible for Non-Title IX Sexual Harassment. *Review Panel Determination ("Determination")*,[4] at HC3621-24.

The Review Panel found that Roe's testimony was persuasive, plausible, and consistent with statements she had made to the investigator. *Green Decl.*, ¶¶ 56-57. The Review Panel also found the testimony of witnesses that interacted with Roe shortly after the interaction with Doe corroborated the key pieces of information that formed the basis of Roe's complaint. *Id.*, ¶ 58.

To the contrary, the Review Panel did not find Doe's testimony to be credible; rather, he was evasive and failed to answer direct questions. Doe's version of the events that occurred in the bathroom was that he and Roe engaged in two or three "consensual pecks," which, given all of the other evidence in the record, lacked plausibility. *Id.*, ¶ 59.

Text messages from Doe to Roe contradicted his own testimony at the hearing that he was not intoxicated. His repeated apologies led the Review Panel to believe that Doe's denials of wrongdoing were without merit. *Id.*, ¶¶ 60-61. As a result of the severity of Doe's conduct and his utter failure to recognize the seriousness of his actions, the Review Panel imposed a sanction of expulsion from Hamilton. *Id.*, ¶ 67.

Doe appealed pursuant to the Policy's procedures, and the appeal was denied. *See generally Marcus Decl. and Exhibit E thereto (the Appeal Decision)*.

---

[4] The Determination of the Review Panel is attached to the Declaration of Julia Green as Exhibit R.

## ARGUMENT

## POINT I

### TITLE IX DOES NOT PROVIDE FOR A FEDERAL APPELLATE LEVEL OF REVIEW

The Second Circuit has stated:

We do not believe that Congress meant for Title IX to impair the independence of universities in disciplining students against whom the evidence of an offense, after a fair hearing, is overwhelming, absent a claim of selective enforcement.

*Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

Doe's lengthy Complaint focuses on his disagreements with evidentiary rulings and his views on how the outcome should have been different based on his interpretation of the testimony and evidence introduced during the hearing.

Importantly, **it is not withing the purview of a district court to second-guess a university's credibility determinations and overall evaluation of the evidence**. *See Yu [v. Vassar Coll.]*, 97 F. Supp. 3d [448] at 462. Rather, where a plaintiff takes issue with a university's credibility determinations, "the Court's role is to consider whether these determinations were motivated by gender bias." *Id.* at 477. A finding that another party's version of events is more credible than plaintiff's, without more, does not demonstrate gender bias. *See Doe v. Colgate Univ.*, 760 Fed. App'x 22, 33 (2d Cir. 2019).

*Doe v. Vassar Coll.*, No. 19-cv-9601, 2019 WL 6222918, at *8 (S.D.N.Y. Nov. 21, 2019) (emphasis added); *Yu v. Vassar Coll.*, 97 F.Supp.3d 448, 477 (S.D.N.Y. 2015) ("[I]t is beyond the Court's purview to second-guess the weight the [review panel] afforded individual pieces of evidence and the credibility determinations that it made; rather, the Court's role is to consider whether these determinations were motivated by gender bias…").

Doe's Complaint is devoted to arguing that "Jane Roe's Accusations Were False." *Compl.*, at p. 17 & ¶¶ 46-57. After a four-day hearing, however, the Review Panel disagreed. The Review Panel found that Roe's testimony was persuasive, plausible, and consistent with statements she

16730907

had made to the investigator. At the hearing, Roe testified that Doe's conduct while in M.L.'s room in North Hall made her embarrassed and uncomfortable. She specifically testified that Doe touched her waist, pulled her closer to him, cupped her breasts over her clothes and squeezed her buttocks. She also testified that Doe bit her ear, and laughed about it when she confronted him about the bite. Then, Roe testified that Doe placed one hand on the upper part of her vagina, as is evidenced by a photograph taken in the room by another student. She said that he grabbed her jaw with one hand and kissed her on the mouth, and that she immediately pulled away from him. To compose herself, Roe testified that she went into the bathroom. *Green Decl.,* ¶ 56.

The Review Panel then found Roe's testimony at the hearing that while inside of the bathroom, she told Doe to "get off of me" and repeatedly told him to "stop" kissing her and touching her to be compelling and credible. She also testified that she was crying and sobbing and that Doe put his hand on her throat and applied pressure to hold her against the wall while he attempted to unbutton her pants. Roe was able to leave the bathroom only because another student began to open the door, causing Doe to move away from her. *Id.,* ¶ 57.

The Review Panel also found testimony of witnesses that interacted with Roe shortly after the interaction with Doe in the bathroom to corroborate the key pieces of information that formed the basis of Roe's complaint. The Review Panel noted that not all witnesses uniformly reported the details that Roe shared with them on October 2. However, witnesses generally reported observing Roe shortly after the bathroom encounter at which time she was shaken up and emotional. Roe and two of her friends reported the incidents with Doe to Resident Assistant Rachel Brimmer shortly after the encounter between Doe and Roe in the bathroom. Rachel Brimmer testified during the hearing that Roe was visibly distraught as she and her friends

recounted the incident with Doe.  In short, Roe's reported level of upset was immediately obvious to those witnesses, all of whom corroborated her distress. *Id.*, ¶ 58.

On the other hand, the Review Panel did not find the testimony that Doe provided to be credible.  During the hearing, he was evasive and failed to answer direct questions asked by the panel members.  Doe's testimony about his level of intoxication was not plausible and was contrary to information he provided to the investigator and to admissions he made in text messages sent on the night of the encounter.  Doe's credibility was further damaged by his attempts to convince two potential witnesses that Roe was trying to involve them in the investigation, and that it would be Roe's fault if they were pulled into the investigation because he knew that neither of the witnesses wanted to be involved.  Finally, Doe's version of the events that occurred in the bathroom was that he and Roe engaged in two or three "consensual pecks"; given all of the other evidence in the record, his story lacked plausibility. *Id.*, ¶ 59.

Doe sent Roe <u>40</u> (<u>forty</u>) text messages in which he repeatedly apologized, badgered Roe to talk to him, and desperately begged Roe to forgive him.  *Green Decl.*, ¶ 60.  These messages would lead any reasonable factfinder to the same conclusion reached by the Review Panel.  Doe stated, *inter alia*, that he "didn't mean to cause…harm"; that he just wanted to have a good time; that "I'm truly sorry"; "I'm sooooo sorry Like I truly am"; "I'll make it better…I promise"; "I get it but [I'm] truly sorry"; "I'll make it better"; "Lemme just get better"; "I'm truly truly truly sorry"; "U know I'm not a bad guy"; "Pls"; "Pls pls"; "I'm soooooo sorry Like truly I am"; "I like sobered up, and it's all hitting me." *Final Investigation Report,* at HC2296-99.

Doe's text messages, sent on October 2 and 3, not only lead the reader to conclude that he engaged in conduct for which even he knew was unacceptable, but they also contradicted Doe's own statements to the investigator and testimony at the hearing that he was not intoxicated.  The

Review Panel found, based on the preponderance of the evidence, that Doe engaged in the non-consensual conduct that was alleged and issued a well-reasoned and thorough determination finding him responsible for violating the Policy.

Plaintiff's attack on the determination of the Review Panel boils down to his belief that Roe should not have been believed. He asks the Court to find that the Review Panel was wrong in its determination, to discredit Roe and to give credence instead to his version of events. "Absent flawed processes and gender bias," however, "a credibility determination made by a university adjudicator cannot be disturbed." *Doe v. Vassar Coll.*, 2019 WL 6222918, at *9 (citing *Yu*, 97 F. Supp. 3d at 477-78); *see also Doe v. Colgate Univ.*, 760 Fed. Appx. 22, 33 (2d Cir. 2019) (a hearing panel's finding that the complainants were more credible than the respondent "does not demonstrate bias: by believing each complainant rather than John Doe, the panel effectively decided that sexual misconduct was more likely to have occurred than not, because each complainant indicated misconduct had occurred that John Doe denied"). There is no serious question as to whether Hamilton followed its Policy or whether gender bias influenced the Review Panel's determination; rather, this record demonstrates that the Policy was followed to a tee and is devoid of evidence of gender bias. Plaintiff cannot seek through this lawsuit another level of appeal resulting in a different outcome.

## POINT II

### DOE'S TITLE IX CLAIM MUST BE DISMISSED

Title IX prohibits the imposition of discipline by a college only where "gender is a motivating factor in the decision to discipline." *Yusuf*, 35 F.3d at 715. Doe alleges an "erroneous outcome" Title IX claim.[5] *See Compl.*, ¶ 73. To succeed, Doe must demonstrate "'(1) articulable

---

[5] Doe includes one sentence in his complaint alleging that "'Selective enforcement/undue severity'" occurred in this case because John Doe was expelled in a case that did not remotely warrant expulsion."

10

doubt as to the accuracy of the outcome of the disciplinary proceeding,' **and** (2) that 'gender bias was a motivating factor behind the erroneous finding.'" *Colgate Univ.*, 760 Fed. Appx. at 30 (citing *Yusuf*, 35 F.3d at 715).

The linchpin in an erroneous outcome Title IX claim is a connection to the plaintiff's gender. *Id.* at 714-716; *see also Yu*, 97 F.Supp.3d at 461-62. "The predominant question is whether the college's actions were motivated by gender bias or if the disciplinary procedures establish a pattern of decision-making that applies a chauvinistic view of the sexes." *Doe v. Trs. of Boston Coll.*, No. 15-cv-10790, 2016 WL 5799297, at *24 (D. Mass. Oct. 4, 2016) (citing *Yu*, 97 F. Supp. 3d at 462). Doe must "demonstrate particular circumstances that suggest bias was the motivating factor." *Id.* (citing *Yusuf*, 35 F.3d at 715). "'Statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender' can create an inference of gender bias." *Doe v. Colgate Univ.*, No. 5:15-CV-1069 (LEK/DEP), 2017 WL 4990629, at *11 (N.D.N.Y. Oct. 31, 2017).

### A. Doe Cannot Reasonably Cast Doubt on the Outcome of the Disciplinary Proceeding

While he alleges in a wholly conclusory manner that "irregularities" in the disciplinary process point to gender bias (*Compl.*, ¶ 71), Doe does not actually identify any flaws in the process in his lengthy Complaint. Indeed, Hamilton conducted its investigation and adjudication in accordance with the Policy. *See generally Berryman Decl.* The investigator conducted a thorough

---

*Complaint*, ¶ 70. To the extent he is attempting to allege a Title IX "selective enforcement" claim, such a claim has no merit. A selective enforcement Title IX claim occurs when, "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf*, 35 F.3d at 715. As explained herein, Doe's mere belief without citation to any admissible evidence is insufficient to defeat a motion for summary judgment. The record demonstrates that the Review Panel considered legitimate, non-discriminatory, and relevant factors when deciding the sanction to impose on Doe, and Doe's reference to a separate, factually distinguishable disciplinary case fails to raise an issue of fact as to Hamilton's alleged gender bias. *Berryman Decl.*, ¶ 82. Accordingly, any selective enforcement theory fails.

investigation, speaking with the parties, several additional witnesses and collecting a variety of evidence. The investigator interviewed all the witnesses that Doe identified (*Doe Depo.*, 110:3-9[6]), Doe had the opportunity to review the transcript of his interview and to provide clarification, revisions, and additional information (*Doe Depo.*, 110:10-25; 11:1-25; 112:1-8). Doe was provided with the opportunity to fully participate in the investigation and the hearing.  He was represented by an attorney advisor from the outset of the investigation and throughout the hearing, and his advisor examined and cross-examined witnesses (*Doe Depo.*, 162:5-22). Doe appealed the determination and sanction through Hamilton's appeal process, and that appeal was denied.  He has not identified any procedural irregularity or flaw that leads to the conclusion that the outcome of the process was erroneous.

### B.  Hamilton's Determination Was Not Motivated by Gender Bias

Doe's challenge to the results of the hearing is driven by his assertion that the Hearing Officer's evidentiary rulings and the Review Panel's credibility determinations and factual findings were biased. Doe alleges that (1) Hamilton's originally appointed Hearing Officer was biased (even though that individual did not ultimately serve as the Hearing Officer); (2) Hearing Officer Green required Doe to limit his closing statement to ten minutes; (3) the investigator and the Hearing Officer excluded a photograph of Roe in her swimsuit and several TikTok videos; (4) the Hearing Officer permitted witnesses M.C. and K.R. to testify at the hearing; (5) the Hearing Officer permitted reputation questions during the hearing;  (6) the Hearing Officer "failed to make clear the role of an advisor and whether Doe or his advisor could cross-examine witnesses and object to evidence during the hearing"; and (7) the Review Panel imposed a disproportionately severe sanction. None of these allegations demonstrate gender bias.

---

[6] Relevant portions of the transcript from Doe's deposition are attached to the Declaration of Suzanne M. Messer, Esq. as Exhibit A.

16730907

1.  <u>Hamilton's Appointment of the Hearing Officer</u>

Doe alleges that Hamilton discriminated against him when it appointed Attorney Bryn Lovejoy-Grinnell as the Hearing Officer to oversee the hearing. *Compl.*, ¶ 36. This allegation is not worthy of much discussion because even if true, in an attempt to alleviate Doe's concerns, Ms. Lovejoy-Grinnell did not act as the Hearing Officer in the Roe-Doe matter. *Berryman Decl.*, ¶¶ 50-55, 87 & *Exs. G-I.*

Doe was notified that Julia Green would be serving as the Hearing Officer. He implies in his Complaint, however, that Hearing Officer Green was biased against him because she is a "self-identified member of the LGBT community." *Compl.*, ¶ 36. Setting aside the brazen offensiveness of this implication, Doe never objected to Ms. Green serving as the Hearing Officer either prior to the commencement of the hearing or at the outset of the hearing. *Hearing Tr. (Day 1)*, at HC12265-66. Doe did not identify any issue with Ms. Green serving as the Hearing Officer until she made certain rulings that did not favor him. This is insufficient to show gender bias.

Doe alleges that Hearing Officer Green "conducted herself as if she was a prosecutor against John Doe," that she asked Roe's witnesses "open-ended questions," corrected their mistakes and did not confront them with inconsistencies between their testimony and the statements that they made to the investigator. *Compl.,* ¶ 38. Ms. Green's role as the Hearing Officer was not to cross-examine witnesses; it was to facilitate the delivery of information. *Policy*, at 32[7]; *Green Decl.*, ¶¶ 9, 69. In the event a witness testified in a manner that did not make sense in comparison to the information they provided during the investigation, Ms. Green asked questions of the witnesses to aid the Review Panel in understanding their testimony. In the event a witness testified inconsistently either with their own prior statements or with the statements of

---

[7] A copy of the Policy is attached to the Berryman Declaration as Exhibit A.

another witness, the Review Panel considered and evaluated the inconsistencies during its deliberations. *Green Decl.*, ¶ 69; *see generally Hearing Trs. (Days 1-4)*[8]. Doe's advisor (an attorney) had the opportunity to cross-examine all witnesses in order to identify any perceived inconsistencies in their testimony, and he did so. A review of the hearing transcript demonstrates that Ms. Green treated all parties fairly and equally throughout the hearing.

### 2. Doe's Closing Statement

Doe alleges that Hamilton discriminated against him because he did not complete his closing statement. *Complaint*, ¶ 39. He alleges that he was not advised of the ten-minute limit (*id*), but when confronted with the transcript of the hearing, was forced to concede that his allegation was untrue. *See Doe Depo.*, 157:13-25; 158:1-25; 159:1-8; *see also Green Decl.*, ¶¶ 20, 70 & *Ex. A*; *Berryman Decl.*, ¶¶ 58, 68 & *Hearing Tr. (Day 4)*, at HC12827.

Regardless, limiting Doe to a ten-minute closing statement cannot be evidence of gender bias because Roe was also limited to a ten-minute closing statement. *Green Decl.*, ¶¶ 21, 70 & *Ex. A*; *Berryman Decl.*, ¶¶ 59, 68 & *Hearing Tr. (Day 4)*, at HC12827.

Further, Doe submitted a written copy of his closing statement to the Review Panel, *Green Decl.*, ¶ 70; *Doe Depo.*, 159:9-20, and the Review Panel did, in fact, consider the statement. *Id.*

### 3. The Exclusion of a Photograph and TikTok Videos

Doe alleges that the Hearing Officer's decisions to exclude certain evidence shows gender bias. *Compl.*, ¶¶ 33.[9] Specifically, Doe complains of the decisions to exclude as evidence a

---

[8] The transcripts from Days 2, 3 and 4 are attached to the Berryman Declaration as Exhibits M, N, and O.

[9] Doe similarly complains that the investigator declined to accept evidence that Doe alleges to have been "highly relevant," but does not identify the referenced evidence. As with the Hearing Officer, the Policy expressly leaves to the Investigator "[d]ecisions about interviews and collection and evaluation of relevant information, physical and electronic documents, and other tangible information…" *Berryman Decl., Ex. A*, at 29. To the extent the complaint's reference relates to the photograph and TikTok videos, the argument above applies equally to the investigator's decision not to accept such evidence as relevant evidence in the

14

photograph Roe sent to Doe in April 2020 and several videos Roe posted on the TikTok social media platform after October 2, 2020. *Id.*, ¶ 45. As stated above, the role of this Court is not to second-guess the Review Panel's evaluation of evidence, and Doe's disagreement with the Hearing Officer's evidentiary ruling is insufficient in and of itself to demonstrate gender bias. *See Yu*, 97 F.Supp.3d at 462. The analysis should stop here.

Even if, however, the validity of Ms. Green's evidentiary rulings is appropriately reviewed in this action (it is not), her decisions about the referenced evidence were made in accordance with both the Policy, which provides the Hearing Officer with discretionary authority over the acceptance or exclusion of evidence (*Policy*, at 32), and Title IX.

The relevant Title IX regulations require decisionmakers to evaluate relevant evidence and exclude irrelevant evidence. *See* 85 Fed. Reg. 30337 (May 19, 2020); 34 CFR §§ 106.45(b)(1)(ii) & (b)(6)(i). Evidence of the prior sexual behavior of a complainant is expressly deemed irrelevant, unless such evidence concerns to whether the complainant consented to the specific incident being adjudicated. 34 CFR § 106.45(b)(5)(i) & (b)(6)(i). An institution's definition of consent determines the scope of the relevance of evidence relating to consent. 85 Fed. Reg. 30353. The Policy's definition of consent (which adheres to the definition of affirmative consent required by New York Education Law Article 129-B, Section 6441), states, in relevant part, that "[c]onsent to any sexual act or prior consensual sexual activity between or with any party does not necessarily constitute consent to any other sexual act." *Policy*, at 12.

It was against this backdrop that Hearing Officer Green issued her determination that the photograph of Roe that was sent to Doe in April of 2020 was not relevant to the issue of whether

---

investigation report. Further, when asked what, if anything, Investigator Stackow did that Doe believed to be unfair during the investigation, Doe was hard-pressed to answer the question, other than to say that he thought Mr. Stackow could have done a better job in the investigation. *Doe Depo.*, 116:6-21.

Roe consented to the conduct of October 2, 2020. *Green Decl., Ex. C.* Specifically, Ms. Green determined that a photograph date-stamped six months before the alleged conduct (and before the parties even met in person) had no temporal relationship to the alleged conduct and could not "create clear permission regarding a willingness to engage" in the sexual activity that occurred on October 2, 2020. *Id.* Similarly, the TikTok videos, all of which were dated after October 2, 2020, were not relevant to "what happened on October 2, 2020; whether or not [Roe] consented to the parties' interaction on October 2, 2020; her character; or the reliability of the information she has shared as part of the investigation or will be asked to share at the hearing about her recollection of that night." *Id.* Ms. Green subsequently denied Doe's request for reconsideration because it was based on certain hearing testimony that was of "the same nature of as the information shared during the investigation," and did not alter the rationale behind her original determination to exclude the requested evidence. *Id., Ex. H.*

The Hearing Officer's determinations were well-reasoned and were grounded in the Title IX regulations and the Policy; Doe's allegations of gender bias are without merit.

### 4. The Testimony of Witnesses

Doe alleges that Hamilton exhibited gender bias when Ms. Green permitted witnesses M.C. and K.R. to testify at the hearing even though the investigator did not originally interview them. *Complaint*, ¶¶ 41-42. Notably, Hearing Officer Green also allowed Doe to present witness S.K. at the hearing, despite the fact that S.K. had not been interviewed as part of the investigation. *Green Decl.,* ¶ 41 & *Ex. I.* Accordingly, <u>both</u> parties benefited from allowing the testimony of witnesses that were not previously identified. And, Ms. Green ruled that M.C. could testify at the hearing only after she was interviewed by the Investigator and after the parties were provided with the transcript of that interview and Doe had the opportunity to provide his position on the

16

admission of M.C.'s testimony.  *Id.*, ¶¶ 22, 24. Doe's advisor had the opportunity to cross-examine M.C. and K.R. during the hearing.

Further, the Hearing Officer did not permit M.C. or K.R. to testify about all of the topics that Roe wanted them to testify about; rather, she limited their testimony to Doe's level of intoxication on the night of October 2, which the Review Panel deemed relevant to Roe's complaint against Doe.[10]  In fact, Ms. Green *twice* denied Roe's request to permit M.C. to testify about an alleged non-consensual interaction between M.C. and Doe.  *Green Decl., Exs. C, E.*

In short, the Hearing Officer issued evidentiary rulings both for and against each party at various times. There is no evidence that those rulings were influenced by gender.

5.   Reputation Questions During the Hearing

Doe alleges that Hearing Officer Green improperly allowed testimony about his reputation during the hearing. *Compl.*, ¶ 40. During the hearing, witness M.H. testified about a phone call with Doe concerning her participation in the investigation.  M.H. testified that when Doe reached out to her via Snapchat to ask for a phone call with her, Doe stated that he did not want to talk about the investigation.  When M.H. and Doe did speak, however, he did want to talk about the case and recorded the phone call without informing M.H. *Hearing Tr. (Day 3)*, at HC12702-03. Doe indicated during the phone call that Roe (rather than Doe) was trying to involve M.H. in the investigation. *Id.,* at HC12703.  M.H. testified that she did not know whether Roe was trying to involve her, but that Doe's phone call "felt like he was trying to put the blame on [Roe] and make

---

[10] The Review Panel found the parties' levels of intoxication to be relevant because intoxication could have impacted their recollections of the events on the night at issue, and understanding their respective levels of intoxication was important for us in determining the weight to give to certain testimony.  Doe's level of intoxication was also relevant because the statements he made in text messages sent contemporaneously and shortly after the events at issue indicated that he was highly intoxicated ("hella sauced" and "sloshed") while he told the investigator and the Review Panel that he was not intoxicated.  These contradictions were relevant to the Review Panel's reliability determinations.  *Green Decl.*, ¶ 74.

me mad at her when I wouldn't be mad at her for saying something like that." *Id.* In connection

with this testimony, Roe's advisor asked about Doe's reputation for truthfulness.

| Roe's advisor: | Do you know anything about whether [Doe] has a reputation for being a truthful or untruthful person? |
|---|---|
| M.H.: | Yes.  I've heard lots of things about Doe on campus.  Not necessarily truthful or untruthful.  I think more of an aggressive…I had heard reports of other girls saying that they felt uncomfortable. |
| Julia Green: | [M.H.], I'm going to stop you there, before you go down that path. The question was truthful or untruthful. |
| M.H.: | Okay. |
| Julia Green: | What is his reputation for truthfulness? |
| M.H.: | Okay, I don't know his reputation for truthfulness versus untruthfulness. |
| Roe's Advisor: | Other than lying to you about why he wanted to speak with you on the phone in November, has he ever told you anything that you know is untruthful? |
| Julia Green: | You can answer that. |
| M.H.: | No. |

*Id.*, at HC12704-05.  Doe contends that the admittance of this testimony is evidence of gender bias.

Under the Title IX regulations, decision-makers must consider relevant evidence and must

not consider irrelevant evidence. 34 CFR § 106.45(b)(6)(i); *see also* 85 Fed. Reg. 30336-37. The

regulations state that certain evidence cannot be considered, including: a complainant's prior

sexual behavior (unless questions or evidence about prior sexual behavior meet one of two

delineated exceptions); information protected by a legally cognizable privilege; a party's treatment

records (without that party's written consent); and statements not subject to cross-examination.  *Id.*

Testimony concerning a party's reputation (*i.e.*, character evidence) does not fall within one of the

regulations' stated exclusions, and, if a decision-maker determines the testimony to be relevant, it

must be considered.

16730907

In conjunction with the release of the Title IX regulations, the Department of Education offered the following concerning the use of character evidence in a college hearing:

> [W]here a cross-examination question or piece of evidence is relevant, but concerns a party's character or prior bad acts, under the final regulations the decision-maker cannot exclude or refuse to consider the relevant evidence, but may proceed to objectively evaluate that relevant evidence by analyzing whether that evidence warrants a high or low level of weight or credibility, so long as the decision-marker's evaluation treats both parties equally by not, for instance, automatically assigning higher weight to exculpatory character evidence than to inculpatory character evidence.

*Green Decl., Ex. K* (quoting 85 Fed. Reg. 30337 (May 19, 2020)).

Consideration of M.H.'s testimony concerning Doe's reputation for truthfulness was consistent with the Title IX regulations and the Department of Education's guidance. Such evidence is not excluded by the regulations and, if relevant, is to be considered by the decision-maker, who is empowered to determine the weight to be given to the evidence.

Perhaps more importantly, Doe does not allege that Hearing Officer Green treated him differently than Roe with respect to character evidence. Even if the decision-makers admitted evidence that should not have been admitted, to be actionable under Title IX, the error had to have been related to Doe's gender and have affected the outcome. There is nothing in the record that indicates a connection between the admission of character evidence and Doe's gender.

6.  <u>The Role of an Advisor</u>

Doe's allegation that Hamilton exhibited gender bias by failing to "make clear the role of an advisor and whether or not John Doe or his advisor could cross-examine witnesses and object to evidence" (*Compl.*, ¶ 80) is refuted by the record. Ms. Berryman provided Doe with a copy of the Policy during her initial meeting with him on November 11, 2020, and advised him of his right to an advisor. *Berryman Decl.*, ¶ 32. The Policy clearly delineates the roles and responsibilities of a party's advisor:

19

> Each party in a formal or informal resolution process may have their advisor of
> choice present at any interview or other meeting related to the investigation and
> resolution process in which the party participates. Except as provided in the hearing
> procedures described in Section H, advisors can only advise the Complainant or
> Respondent privately and cannot act as speaking advocates in the investigation,
> adjudication, or informal resolution process.

*Policy*, p. 27. Section H explains the role of a party's advisor during a hearing. *Id.,* at 32-33.

In addition to being provided with the Policy at the outset of the process, Doe and his advisor attended a pre-hearing conference with Ms. Berryman and Ms. Green, at which the hearing procedures were discussed. *Berryman Decl.*, ¶ 58; *Green Decl.*, ¶ 20. There is no evidence in the record indicating that Doe was not provided with sufficient information about Mr. Santangelo's role or that Doe was not provided with the same information as was Roe. Indeed, Mr. Santangelo cross-examined witnesses throughout the hearing. *See generally Hearing Tr. (Days 1-4)*.

7.   The Sanction of Expulsion

Finally, Doe claims that Hamilton's "anti-male gender bias" was reflected "in a wildly disproportionate sanction." *Compl.*, ¶ 82. As discussed in the Notice of Determination, the Review Panel determined that the conduct for which Doe was responsible was severe – the Review Panel members determined that Doe had not only touched Roe's intimate body parts without her affirmative consent, but that he had disregarded her sobs and struggles to break free from the contact while pinning her against the bathroom wall by her throat. The Review Panel further noted that Doe had been "less than forthright" throughout the investigation and adjudication of the complaint against him, and that his impact statement did not indicate any understanding of the seriousness of his misconduct. *Green Decl.,* ¶ 67.[11] In addition, the Review Panel's imposition of

---

[11] Doe's attempt to compare his sanction to that of his roommate's must be disregarded because Doe's complaint mischaracterizes the referenced disciplinary case. In fact, in the "roommate" case, the respondent was found responsible only for one count of Title IX Non-Consensual Sexual Contact for spanking another student without consent in the context of a long-term consensual relationship. The facts of the two cases are vastly different, likely leading to the difference in sanction. *See Berryman Decl.*, ¶ 82.

16730907

the sanction of expulsion is consistent with other decision panels at Hamilton that have expelled students for similar, non-consensual sexual violations under the Policy. *Berryman Decl., Ex. Q.*

## C.  Doe's Allegations of Outside Pressure are Speculative

Doe makes sweeping and conclusory allegations that Hamilton found him responsible because it was responding to federal government and student group pressure to aggressively discipline male students. *Complaint*, ¶¶ 73-78. This is not a novel theory, and such allegations are insufficient to support an inference of gender bias. *Colgate Univ.*, 760 Fed. Appx. at 30 (rejecting that the "Dear Colleague letter," a sexual climate forum and a message from the University's president concerning sexual harassment gave rise to a genuine issue of material fact that Colgate was under pressure to punish male students accused of sexual assault); *Doe v. Syracuse Univ.*, 457 F.Supp.3d 178, 202 (N.D.N.Y. 2020) (TJM/ATB) (finding that criticism of the University by the student body and the presence of an Office of Civil Rights investigation, without any evidence that the Conduct Board had awareness of the investigations or that "they had any part in or agreement with a climate at the University that favored women over mean in sexual misconduct investigations" was insufficient to defeat summary judgment on an erroneous outcome claim); *Doe v. New York Univ.*, 438 F.Supp.3d 172, 185-86 (S.D.N.Y. 2020) (holding that conclusory allegations about articles, social media posts, the #MeToo movement and the "Dear Colleague letter" insufficient to establish a "plausible inference of sex discrimination").  The record is devoid of any evidence that any outside pressures influenced Doe's disciplinary proceeding.

## D.  There is No Pattern of Gender-Biased Decision Making at Hamilton

Doe alleges that "Hamilton has exhibited a distinctly consistent pattern of decision-making against a male party and in favor of a female party..." *Compl.*, ¶ 77.  There is no such evidence. *See Berryman Decl., Ex. Q.* The fact that expelled students have been male is merely a function of

16730907

the gender makeup of the alleged policy violators brought to Hamilton's attention; Hamilton can only respond to complaints that it receives. Hamilton does not commit gender bias by addressing complaints even if they are always brought against men.  *Syracuse Univ.*, 457 F.Supp.3d at 186 (holding that statistics cited by the plaintiff were "not evidence that the University acted with any particular animus. While they demonstrate that a man was the respondent in nearly every sexual misconduct case, he does not point to any evidence indicating that the University refused to investigate or prosecute women. He points to no evidence showing that this disparity in numbers was the result of any choice by Syracuse.").

In sum, Doe's Title IX claims must be dismissed.

### POINT III

### DOE'S BREACH OF CONTRACT AND PROMISSORY ESTOPPEL CLAIMS MUST BE DISMISSED

Doe alleges that Hamilton breached the Policy by failing to "have impartial investigators and hearing officers to conduct a fair and impartial process," by failing to "adhere to the preponderance of the evidence standard," and by imposing a disproportionally severe sanction. *Compl.*, ¶¶ 89-90.  Doe has not adequately alleged, let alone proven, a breach of contract.

In New York, the relationship between a college and its students is contractual in nature, but to succeed on a claim for breach of contract against a college, a student must identify "specifically designated and discrete promises" that were breached.  *Nungesser v. Columbia Univ.*, 169 F.Supp.3d 353, 369-70 (S.D.N.Y. 2016) (citation omitted); *Doe v. Syracuse Univ.*, No. 5:18-cv-377, 2019 WL 2021026, at *10 (N.D.N.Y. May 8, 2019) (DNH). When a disciplinary dispute arises between a student and an institution, "judicial review of the institution's actions is limited to whether the institution acted arbitrarily or whether it substantially complied with its own rules and regulations."  *Routh v. Univ. of Rochester*, 981 F.Supp.2d 184, 208 (W.D.N.Y. 2013).

It is well-settled that "broad and unspecified procedures and guidelines" do not suffice to support a breach of contract claim between a student and his college. *Nungesser*, 169 F. Supp. 3d at 370 (citing *Gally v. Columbia Univ.*, 22 F.Supp.2d 199, 208 (S.D.N.Y. 1998) ("General promises about ethical standards" that are "subject to neither quantification nor objective evaluation" "are far different from the types of specific promises which have led to valid breach of contract claims against universities.")); *Doe v. Syracuse Univ.*, 341 F.Supp.3d 125, 140-41 (N.D.N.Y. 2018) (TJM) (general statements of policy such as the failure to conduct a "full and fair investigation" and a "lack of fundamental fairness" do not support a viable breach of contract claim). Accordingly, Doe's allegations that Hamilton breached an obligation to offer a fair and impartial process do not sufficiently allege a specific promise enforceable as a breach of contract.

Even if Doe's Complaint did assert a breach of a specific promise (it does not), Doe's allegations in support of this theory of breach have no merit. He alleges that he was deprived of a fair and impartial process because the Review Panel reached a decision that he alleged was contrary to the evidence. However, the outcome of the disciplinary action is not reviewable as a matter of law in the form of a breach of contract cause of action. *See Prasad v. Cornell Univ.*, No. 5:15-cv-322, 2016 WL 3212079, at *20 (N.D.N.Y. Feb. 24, 2016) (TJM) (holding that a breach of contract claim is not the appropriate remedy to challenge a disciplinary determination).

Doe's allegations concerning the preponderance of the evidence standard and a shifting burden of proof were first raised during his closing statement. The Review Panel addressed Doe's apparent misunderstanding of these concepts:

> In his closing statement, [Doe] made multiple references to Hamilton's "burden of proof." To clarify, Hamilton is responsible for determining whether allegations are demonstrated by a preponderance of the evidence, but does not act for or on behalf of either party and as such does not itself have a burden of proof. Rather, the College has an obligation to provide both parties the opportunity to submit information and evidence, including witnesses, supporting their version of events and experience,

23

16730907

> and Hamilton must independently search for and evaluate relevant inculpatory and exculpatory information and evidence.  All of this information and evidence is presented to the Review Panel, which then applies a standard of evidence – preponderance of the evidence, as stated above – to find facts and then apply the applicable Policy provisions to those facts.

*Determination*, at 5 n.1. Doe's allegations that Hamilton failed to follow the preponderance of the evidence standard boil down to nothing more than his disagreement with the Review Panel's evaluation of the evidence. This is insufficient to support a breach of contract claim. Doe's allegations concerning the imposition of expulsion as a sanction similarly fail. The Policy provides for expulsion as a potential sanction. *Policy*, at 34-35.

Doe's simultaneously pled promissory estoppel claim is easily disposed of. "Where an enforceable contract exists, the doctrine of promissory estoppel is inapplicable and a plaintiff cannot recover under this theory." *Kant v. Columbia Univ.*, No. 08-cv-7476, 2010 WL 807442, at *4 (S.D.N.Y. Mar. 9, 2010). The Policy is an enforceable contract between Doe and Hamilton. That he cannot prove a breach of any contractual provision does not give rise to a promissory estoppel claim.  Summary judgment should therefore be granted dismissing Plaintiff's third cause of action.

## <u>CONCLUSION</u>

For the foregoing reasons, and Plaintiff's Complaint must be dismissed in its entirety.

Dated:  November 15, 2023                    BOND, SCHOENECK & KING, PLLC


By:   */s/Suzanne M. Messer*
       Jonathan B. Fellows
       Suzanne M. Messer
       Collin M. Carr
One Lincoln Center
Syracuse, New York 13202-1355
Telephone: (315) 218-8000

*Attorneys for Defendant*
*Trustees of Hamilton College*

25

16730907