UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOHN DOE,

                Plaintiff,

          -v-                   6:22-CV-214

TRUSTEES OF HAMILTON COLLEGE,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:             OF COUNSEL:

NESENOFF & MILTENBERG, LLP   ANDREW T. MILTENBERG, ESQ.
Attorneys for Plaintiff        TARA J. DAVIS, ESQ.
363 Seventh Avenue, 5th Floor
New York, NY 10001

LAW OFFICE OF MICHAEL G.    MICHAEL G. SANTANGELO, ESQ.
   SANTANGELO, PLLC
Attorneys for Plaintiff
75 South Broadway
White Plains, NY 10601

BOND SCHOENECK & KING, PLLC  JONATHAN B. FELLOWS, ESQ.
Attorneys for Defendant       COLLIN MICHAEL CARR, ESQ.
One Lincoln Center          SUZANNE M. MESSER, ESQ.
Syracuse, NY 13202

DAVID N. HURD
United States District Judge

## DECISION and ORDER

## I.  INTRODUCTION

On March 4, 2022, plaintiff John Doe[1] ("Doe" or "plaintiff"), a former student, filed this Title IX action against defendant Trustees of Hamilton College  ("Hamilton" or "defendant") alleging that gender bias played a role in his expulsion from the university in 2021.  Dkt. No. 1.  Doe's three-count complaint asserts claims for violations of Title IX, breach of contract, and promissory estoppel.  Dkt. No. 28.

On November 15, 2023, Hamilton moved pursuant to Federal Rule of Civil Procedure ("Rule") 56 for summary judgment on Doe's claims.  Dkt. No. 34. The motion has been fully briefed and will be considered on the basis of the submissions without oral argument.  Dkt. Nos. 51, 59.

## II.  BACKGROUND[2]

Hamilton is a private, liberal arts college located in Clinton, New York. Defendant's Statement of Material Facts ("Def.'s Facts"), Dkt. No. 34-1 ¶ 2. Doe is a former student.  Def.'s Facts ¶ 1.  He enrolled in the fall of 2020 and

---

[1]  Plaintiff's request to proceed under the pseudonym "John Doe," Dkt. No. 2, was granted on June 6, 2022.  Dkt. No. 13.

[2]  The following facts are drawn from the parties' statements of undisputed material facts and responses pursuant to Local Rule 7.1(a)(3), to the extent those facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein.

joined Hamilton's football team.  Plaintiff's Statement of Material Facts ("Pl.'s Resp."), Dkt. No. 51-18 ¶ 1.

## A. <u>Hamilton's Sexual Misconduct Policy</u>

During the 2020–21 academic year, Hamilton maintained a "Sexual Misconduct Policy" (the "Policy").  Def.'s Facts ¶ 3.  The Policy defined sexual misconduct and provided procedures for Hamilton to respond to students' complaints of sexual misconduct.[3]  Def.'s Facts ¶¶ 3–5; Ex. A to Berryman Decl. ("Def.'s Ex. A"), Dkt. No. 34-3 at 6.

The Policy imposed an "investigation and hearing" model for reviewing sexual misconduct complaints.  Def.'s Facts ¶ 6.  Sexual misconduct complaints were first investigated by an investigator (the "Investigator") and then adjudicated at a hearing by a "Review Panel" and a "Hearing Officer." *Id.*; Def.'s Ex. A at 16.

At the outset of any investigation, the Title IX Coordinator would select an Investigator.  Def.'s Facts ¶ 9.  The Investigator would be responsible for "interviewing the parties and any witnesses and for collecting and maintaining any records, documents, or other items relevant to the investigation." *Id.*

---

[3]  The Policy further guarantees that "[c]ollege policies and procedures [will be] followed without material deviation[.]"  Pl.'s Resp. ¶ 6; Ex. H to Miltenberg Decl. ("Pl.'s Ex. H"), Dkt. No. 51-9 at 22.

At the conclusion of the investigation, each party would be permitted to review a draft of the investigation report and have ten days to submit a response. Def.'s Facts ¶¶ 14–15; Def.'s Ex. A at 30–31. This period is referred to as the "review and comment" period. Def.'s Facts ¶ 16. After this "review and comment" period, the Investigator would finalize the investigation report. *Id.* The parties, the Review Panel and the Hearing Officer would receive copies of the final report. *Id.* ¶¶ 17, 19; Def.'s Ex. A at 31.

The Title IX Coordinator would then convene a Review Panel and select a Hearing Officer to preside over the hearing. Def.'s Facts ¶ 18. At the start of the hearing, each party would be permitted to give an opening statement. *Id.* ¶ 21. The Hearing Officer would then ask the Investigator to provide a summary of the investigation. Pl.'s Resp. ¶ 21; Pl.'s Ex. H at 33. The Investigator, the parties, and any witnesses would then be permitted to offer testimony and be questioned by the parties. Def.'s Facts ¶ 21; Pl.'s Resp. ¶ 21; Pl.'s Ex. H at 33.

The Review Panel and the Hearing Officer would be tasked with evaluating the parties' evidence and deciding whether the respondent violated the Policy. Def.'s Facts ¶ 24. During the hearing, the formal rules of evidence would not apply. *Id.* ¶ 22. Instead, the Hearing Officer would be responsible for addressing the parties' evidentiary concerns. *Id.* ¶ 23. In

reviewing the evidence, the Review Panel would adhere to a "preponderance of the evidence" standard of proof.[4]  *Id.* ¶ 24; Pl.'s Resp. ¶ 24; Pl.'s Ex. H at 35.

The Review Panel would then prepare a written decision including the nature of the charges adjudicated and a decision regarding any sanctions to be imposed.  Def.'s Facts ¶ 26.  The parties would have seven days from receipt of the Review Panel's written decision in which to file an appeal.  *Id.* ¶ 28.

Appeals are governed by Hamilton's Appeals Board, which is comprised of three faculty members.  Def.'s Facts ¶¶ 29, 31.  In the case of an appeal, the Appeals Board would review the procedures by which the original decision was reached.  *Id.* ¶ 30.  Once a decision is reached, the Chair of the Appeals Board would provide written notice of the decision to the parties, the Chair of Hamilton's Sexual Misconduct Board, and the Title IX Coordinator.  *Id.* ¶ 35. The Appeals Board's decisions are final.  *Id.* ¶ 36.

### B.  Roe's Sexual Misconduct Complaint

On October 2, 2020, North Hall residence hall ("North Hall") resident assistant Rachel Brimmer ("Brimmer") notified the Title IX Coordinator, Catherine Berryman ("Coordinator Berryman") of reported sexual

---

[4]  According to the Policy, a "'[p]reponderance of the evidence' means that the decision maker. . . must determine whether, based on the evidence presented, it is more likely than not that the Respondent engaged in the conduct charged [and violated the Policy]."  Pl.'s Ex. H at 35.

misconduct.  Def.'s Facts ¶ 37.  Brimmer stated that a student, Jane Roe ("Roe"), reported that Doe had sexually assaulted her.  *Id.*

Coordinator Berryman met with Roe on October 5, 2020.  Def.'s Facts ¶ 39.  During their meeting, Roe accused Doe of committing sexual misconduct on October 2, 2020.  *Id.* ¶ 38.  Roe later submitted a written complaint.  *Id.* ¶ 39.

**C.  <u>The Investigation</u>**

Coordinator Berryman appointed Michael Stackow of Cozen O'Connor to serve as the Investigator.  Def.'s Facts ¶ 43.  During the investigation, Doe and Roe were each interviewed separately.  Def.'s Facts ¶ 48; Pl.'s Resp. ¶ 48.  Those interviews revealed dueling narratives of what transpired on October 2, 2020.  Def.'s Facts ¶ 48; Pl.'s Resp. ¶ 48.

According to Roe, she was approached by plaintiff while using the restroom on the fourth floor of North Hall.  Def.'s Facts ¶ 48.  Roe was in a bathroom stall when plaintiff entered the women's restroom.  *Id.*  After Roe exited the stall, she asked plaintiff why he was using the women's restroom.  *Id.*  When Roe walked to the sink to wash her hands, plaintiff walked up behind her, grabbed her buttocks and her breasts, and ground his erect penis against her.  *Id.*  Roe told plaintiff to stop.  *Id.*  According to Roe, she kept her tone conversational to not escalate the situation.  *Id.*  When Roe tried to leave the restroom, plaintiff grabbed her hips and pushed her against the wall.  *Id.*

Roe told plaintiff to stop, again. *Id.* Plaintiff forcibly kissed Roe. *Id.* Roe asked him to stop. *Id.* Plaintiff pinned Roe against the wall with his pelvis and held her arms at her side to prevent her from pushing him away. *Id.* Roe told plaintiff to stop. *Id.* Plaintiff began to touch Roe's breasts under her shirt and rubbing her vaginal area through her pants. *Id.* Roe began to cry, but plaintiff did not relent. *Id.* Roe continued to ask plaintiff to stop. *Id.* Plaintiff then placed his hand around Roe's throat, pushed her head into the wall, and began unbuttoning her jeans to reach into her pants with his free hand. *Id.* Roe continued to cry and begged plaintiff to stop. *Id.* Roe believed plaintiff was going to rape her and began to mentally prepare herself for what might happen next. *Id.* The incident ended only when a friend of Roe, "A.S." walked into the restroom. *Id.* The bathroom door hit plaintiff on the head and knocked him off Roe. *Id.* Roe then ran out of the bathroom.[5] *Id.*

Doe denies Roe's version of events. Pl.'s Resp. ¶ 48. According to plaintiff, he met Roe on the fourth floor of North Hall on October 2, 2020, 9 PM. *Id.* at 72. Roe told him that she was intoxicated before the pair socialized with other students in a dorm room. *Id.* When plaintiff was asked to leave the dorm room due to COVID-19 protocol, he complied and returned to his friends in the hallway. *Id.* When plaintiff needed to use the restroom, another

---

[5] Roe's version of events is taken from her interview the Investigator on November 18, 2020. Ex. F to Berryman Decl. ("Def.'s Ex. F"), Dkt. No. 42-1 at 83–123.

student directed him to one at the end of the hallway.  *Id.*  Plaintiff went to the restroom, went into a stall, urinated, and proceeded to the sink to wash his hands when Roe emerged from a stall.  *Id.*   Roe asked plaintiff why he was using the women's restroom.  *Id.*  Plaintiff apologized to Roe.  *Id.*  Roe told him that it was okay, and the two began to make small talk.  *Id.*  On their way out of the restroom, plaintiff put his arm around Roe's waist and Roe kissed him.  *Id.*  Plaintiff and Roe kissed two to three times, face to face, before the bathroom door hit him on the head and another student walked in. *Id.*  Plaintiff returned to his friends and Roe returned to the dorm room.[6]  *Id.*

After their interviews, Doe and Roe revised their transcripts and provided comments.  Def.'s Facts ¶ 50.  Thereafter the Investigator prepared a draft of the investigation report.  *Id.* ¶ 51.  Roe and Doe each provided written responses to the draft investigation report.  *Id.* ¶¶ 52, 55.

In his response, Doe provided the Investigator with additional questions for both the witnesses and Roe.  Pl.'s Facts ¶ 55.  Plaintiff also provided additional evidence including a photograph and Tik Tok videos of Roe.  Def.'s Facts ¶ 52.  The Investigator conducted a follow-up interview with plaintiff to ask him about the additional evidence.  *Id.* ¶ 53.  After the interview, the

---

[6]  Doe's version of events is taken from his December 7, 2020, written response to Roe's formal complaint.  Ex. I to Berryman Decl. ("Def.'s Ex. I"), Dkt. No. 34-11 at 69–74.  Plaintiff was also interviewed by the Investigator on December 21, 2020, Def.'s Ex. I at 138–72, and on April 24, 2021, *Id.* at 173–90.

Investigator concluded that the evidence was irrelevant to Roe's allegations and excluded it from the final investigation report.  *Id.* ¶ 54.

The Investigator then prepared an updated draft investigation report, incorporating the parties' written responses.  Def.'s Facts ¶ 56.  The final investigation report was completed and sent to the parties on June 22, 2021. *Id.* ¶ 60; Pl.'s Resp. ¶ 60.

### D.  <u>The Review Panel and Hearing Officer</u>

On June 10, 2021, a notice of hearing was sent to the parties.  Def.'s Facts ¶ 58.  On June 20, 2021, Coordinator Berryman informed Doe that the Review Panel would be composed of two College faculty members and that Bryn Lovejoy-Grinnell, Esq. ("Lovejoy") would serve as the Hearing Officer. *Id.* ¶ 61.

On June 22, 2021, Doe raised concerns about Lovejoy's possible bias against male respondents because of the personal beliefs she shared on her social media accounts and her past work as an advocate for victims of sexual abuse.  Def.'s Facts ¶ 62; Pl.'s Resp. ¶ 62; Ex. H to Berryman Decl. ("Def.'s Ex. H"), Dkt. No. 34-10 at 2–3; Def.'s Ex. I at 2–3.  Coordinator Berryman was responsive to plaintiff's concerns and replaced Lovejoy with Julia Green, Esq. ("Green") on June 28, 2021.  Def.'s Facts ¶ 63.

Doe was acquainted with Green.  Pl.'s Resp. ¶¶ 63, 64.  Green had served as the Investigator in another sexual misconduct investigation in which Doe

was a witness.  *Id.* ¶¶ 63, 64; Green Decl., Dkt. No. 34-19 at 5.  Doe believed

that Green had already formed an opinion about him because of their

previous interactions.  Pl.'s Resp. ¶¶ 63, 64.  Although Doe did not object to

Green's appointment as the Hearing Officer, he doubted her ability to remain

impartial towards him.  *Id.*  Green informed Berryman of her previous work

with plaintiff but indicated that she did not believe there was a conflict of

interest.  *Id.* ¶ 63; Green Decl. at 5.  Coordinator Berryman also believed

there was no conflict of interest and Green proceeded as the Hearing Officer.

Green Decl. at 5.

### E.  Evidentiary Rulings Prior to the Hearing

On July 22, 2021, Doe and his advisor attended the pre-hearing conference

with Coordinator Berryman and Green.  Def.'s Facts ¶ 65.  Roe and her

advisor also attended a pre-hearing conference the next day.  *Id.* ¶¶ 66–67.

At that time, Roe requested that two additional witnesses be permitted to

testify before the Review Panel: "S.T." and "M.C."  *Id.*

Because Doe was not present at Roe's pre-hearing conference, he learned

of the additional witnesses via email that evening, only four days before the

hearing was scheduled to begin on July 27, 2021.  Pl.'s Resp. ¶ 67; Ex. K to

Berryman Decl. ("Def.'s Ex. K"), Dkt. No. 34-13 at 2.  Plaintiff requested an

adjournment of the hearing because S.T. and M.C. had not yet been

interviewed.  Pl.'s Resp. ¶ 67; Def.'s Ex. K at 2.  Berryman agreed to adjourn the hearing.  Def.'s Facts ¶¶ 68, 69.

S.T. ultimately chose not to participate in an interview with the Investigator or testify at the hearing.  Def.'s Facts ¶ 70.  M.C. was interviewed on July 25, 2021.  *Id.* ¶ 71.  A transcript of M.C.'s interview was provided to plaintiff for his review.  *Id.*

**F.  The Hearing**

On August 16, 2021, the hearing began.  Def.'s Facts ¶ 83.  At the outset of the hearing, Green explained the purpose of the hearing, the privacy and decorum expectations of the parties, and read the allegations and charges. *Id.*  Both parties gave opening statements.  *Id.* ¶¶ 86–89.

Roe offered her testimony and answered questions from Doe's advisor and the Review Panel regarding her version of events.  Def.'s Facts ¶¶ 90, 91. Doe also testified and was questioned the Review Panel.  *Id.* ¶ 92.  The hearing was adjourned for the day.  *Id.* ¶ 94.

On August 17, 2021, the hearing resumed.  Def.'s Facts ¶ 94.  Doe answered questions from Roe's advisor regarding his version of events.  *Id.* Several witnesses testified and were questioned by the parties' advisors.  *Id.* ¶ 95.  When the hearing had not been completed, it was adjourned until September 1, 2021.  *Id.* ¶ 96.

On August 20, 2021, Green issued another decision addressing the parties' evidentiary concerns.  Def.'s Facts ¶¶ 74–75; Ex. D to Green Decl. ("Def.'s Ex. D"), Dkt. No. 34-23 at 2–3; Ex. E to Green Decl. ("Def.'s Ex. E"), Dkt. No. 34-24 at 2.  Green denied Doe's request to introduce the photograph and Tik Tok videos of Roe at the hearing and denied Roe's request for M.C. to testify about an allegedly non-consensual interaction with plaintiff.   Def.'s Facts ¶¶ 74–75; Def.'s Ex. D at 2–3; Def.'s Ex. E at 2.  Green granted Roe's request to allow M.C. to testify only about her observations of Doe's level of intoxication on the night of October 2, 2020.  Def.'s Facts ¶ 75.

Doe objected to Green's decision to permit M.C.'s limited testimony.  Def.'s Facts ¶ 76.  Doe argued that M.C. did not state in her prior interview with the Investigator that she had seen Doe on the night of the incident or that she had any personal knowledge of his intoxication.  Pl.'s Resp. ¶ 76; Ex. G to Green Decl. ("Def.'s Ex. G"), Dkt. No. 34-26 at 2.  Doe also argued that Green's decision to permit M.C. testify so soon before the next hearing date would impact his ability to cross-examine the witness.  Pl.'s Resp. ¶ 76; Def.'s Ex. G at 2.  Doe requested that a rebuttal witness, "S.K." be permitted to testify to refute M.C.'s testimony regarding his intoxication on October 2, 2020.  Def.'s Facts ¶ 97.  Green granted plaintiff's request to permit S.K.'s testimony on August 30, 2021.  Def.'s Facts ¶ 98; Def.'s Ex. I at 1.

On September 1, 2021, more witnesses testified and were cross-examined by the parties' advisors. Def.'s Facts ¶¶ 100–01. The hearing was then adjourned again until September 11, 2021. *Id.* ¶ 102.

On September 4, 2021, Doe again renewed his request to introduce the photograph and Tik Tok videos. Def.'s Facts ¶ 105. On September 6, 2021, Roe requested that another witness, "K.R." be permitted to testify at the final day of the hearing. *Id.* ¶ 107. Doe objected to the introduction of K.R.'s testimony. *Id.* ¶¶ 108–09.

On September 9, 2021, Green informed the parties that she was again declining to admit the photograph and Tik Tok videos Doe sought to introduce and that K.R. would be permitted to testify regarding whether Doe was intoxicated on the night of the incident. Def.'s Facts ¶ 110.

On September 11, 2021, the remaining witnesses, including M.C., K.R., and S.K., testified and were questioned by the Review Panel and the parties' advisors. Def.'s Facts ¶ 111. Doe's advisor was not permitted to ask K.R. why she had come forward so late in the review process. *Id.* ¶ 95.

At the conclusion of the hearing, Green advised the parties that closing statements would be limited to ten minutes. *Id.* ¶ 113. Doe had not received notice of this rule prior to the start of the hearing process and had prepared a

closing statement that exceeded ten minutes.[7]  Pl.'s Resp. ¶ 113.  Each of the

parties then gave closing statements.  *Id.* ¶ 112.

Doe was cut off after ten minutes.  Pl.'s Resp. ¶ 113.  The parties were

permitted to give written copies of their closing statements to the Review

Panel for consideration.  Def.'s Facts ¶¶ 115–16.

### G.  The Review Panel's Decision

On October 18, 2021, the Review Panel issued a decision to the parties.

Def.'s Facts ¶ 117.  The Review Panel found Doe responsible for "Non-

Consensual Sexual Contact" under the Policy.  *Id.* ¶ 118.  The Review Panel

concluded that plaintiff should be expelled from Hamilton.  *Id.* ¶ 121.

Plaintiff disputed these findings.  Pl.'s Resp. ¶¶ 118–19.

### H.  Doe's Appeal

On October 25, 2021, Doe appealed the Review Panel's decision.  Def.'s

Facts ¶¶ 123–24; Pl.'s Resp. ¶ 123.  Doe's appeal highlighted what he

believed was the biased nature of the underlying hearing.  Pl.'s Resp. ¶ 124.

On November 7, 2021, the Appeals Board convened to discuss Doe's

appeal.  Def.'s Facts ¶¶ 128–29.  The Appeals Board voted unanimously to

affirm the Review Panel's decision.  *Id.*  The Chair of the Appeals Board

---

[7]  The Policy does not include a time limit on closing statements.  Pl.'s Resp. ¶ 113; Pl.'s Ex. H at 22.

informed Doe of its decision to deny his appeal on November 13, 2021.  *Id.* ¶ 130.

The decision from the Appeals Board was the final step in the resolution process under the Policy.  Def.'s Facts ¶ 131.  As a result, Doe was expelled from Hamilton in November 2021.  Pl.'s Resp. ¶ 130.  Doe's academic transcript was then notated, stating that he was "expelled after a finding of responsibility for a code of conduct violation."  Def.'s Facts ¶ 132.

## III.  **LEGAL STANDARD**

Under Rule 56, summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.*  In reviewing the motion, the district court must "draw all reasonable inferences against the party whose motion is under consideration."  *Williams v. MTA Bus Co.*, 44 F.4th 115, 125 (2d Cir. 2022) (citation omitted).

## IV.  **DISCUSSION**

Doe has asserted claims for violations of Title IX, breach of contract, and promissory estoppel.  Compl. ¶¶ 64–83, 87–92, 94–98.  Defendant has moved

for summary judgment dismissing plaintiff's amended complaint.  Def.'s

Mem. at 2, Dkt. No. 34-48.[8]  In brief, defendant argues that its decision to

expel plaintiff was not motivated by gender bias but was based on credible

evidence of sexual misconduct.  Def.'s Mem. at 2.

### A.  **Title IX** (Count I)

Doe has asserted a Title IX claim against Hamilton.  Compl. ¶¶ 64–83.

Plaintiff alleges that defendant's decision to expel him for violating the Policy

was an erroneous outcome motivated by anti-male gender bias.[9]  *Id.*

Defendant argues that it is entitled to summary judgment on this claim

because there is no evidence to establish that he was expelled because of anti-

male gender bias.  Def.'s Mem. at 15–26.

In the context of university disciplinary proceedings, "Title IX bars the

imposition of . . . discipline where gender is a motivating factor in the

decision to discipline."  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

"Generally, a plaintiff may challenge university disciplinary proceedings by

bringing two types of Title IX claims—claims of erroneous outcome or

---

[8]  Pagination corresponds to CM/ECF.

[9]  Doe's complaint contains Title IX claims for both erroneous outcome and selective enforcement.  Compl. ¶ 70.  However, it is clear that plaintiff is only pursuing an erroneous outcome claim.  Pl.'s Opp'n at 12–26.  Plaintiff has not put forth any arguments in support of a selective enforcement claim in his opposition papers.  *Id.*

selective enforcement." *Doe v. N.Y. Univ.*, 438 F. Supp. 3d 172, 181 (S.D.N.Y. 2020) (quoting *Yusuf*, 35 F.3d at 715).

As one might expect, plaintiffs bringing an erroneous outcome claim argue that their university was motivated by gender bias when it took an adverse action against them. *See Roe v. St. John's Univ.*, 91 F.4th 643, 652 (2d Cir. 2024) (quotation omitted). To demonstrate an erroneous outcome, plaintiffs "must demonstrate (1) articulable doubt as to the accuracy of the outcome of the disciplinary proceeding, and (2) that gender bias was a motivating factor behind the erroneous finding." *Doe v. Colgate Univ.*, 457 F. Supp. 3d 164, 170 (N.D.N.Y. 2020) (Scullin, J.) (cleaned up); *Yusuf*, 35 F.3d at 715.

### 1. **Articulable Doubt**

To establish articulable doubt, plaintiffs must demonstrate "particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of the complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge[,] [or] particular procedural flaws affecting the proof." *Yusuf*, 35 F.3d at 715; *Doe v. Hamilton Coll.*, 2023 WL 8782020, at *22 (N.D.N.Y. Dec. 19, 2023) (Suddaby, J.).

Upon review of the submissions, there are genuine disputes of material fact over whether Doe committed sexual misconduct, and, relatedly, whether he violated the Policy. Pl.'s Resp. ¶ 48. According to plaintiff, he did not

engage in any non-consensual sexual contact with Roe.  Pl.'s Resp. ¶¶ 48, 71–72.  Viewed in the light most favorable to him, plaintiff's assertion that he did not commit the misconduct is sufficient to resist summary judgment on the articulable doubt prong of an erroneous outcome claim.  *See St. John's Univ.*, 91 F.4th at 653; *Colgate Univ.*, 457 F. Supp. 3d at 171.

## 2. **Gender Bias**

Next, Doe must establish gender bias.  To establish gender bias, plaintiffs can rely on direct evidence including "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender."  *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 474–75 (S.D.N.Y. 2015) (quoting *Yusuf*, 35 F.3d at 715).

Alternatively, plaintiffs can establish an inference of gender bias by showing "a combination of (1) procedural irregularities that show a biased process, and (2) surrounding circumstances that suggest that 'this bias was likely a sex-based bias.'"  *Doe v. Rochester Inst. of Tech.*, 2024 WL 1051953, at *10 (N.D.N.Y. Mar. 11, 2024) (quoting *Menaker*, 935 F.3d at 32).

In 2016, the Second Circuit held that Title IX claims are subject to the *McDonnell Douglas* burden shifting framework.  *Doe v. Columbia Univ.*, 831 F.3d 46, 55–56 (2d Cir. 2016).  Hamilton has already offered a legitimate, non-discriminatory reason for expelling Doe: that Roe's evidence supported

its decision that plaintiff violated the Policy.  Therefore, the question on summary judgment is whether plaintiff has marshaled evidence from which a rational fact-finder could conclude that defendant intentionally discriminated against him.  *Id.* at 54 (quoting *Littlejohn v. City of N.Y.*, 795 F.3d 297, 307–08 (2d Cir. 2015)).

Hamilton argues that Doe has no evidence of anti-male bias at the university.  Def.'s Mem. at 25–26.  Plaintiff responds that evidence of procedural irregularities during the hearing combined with evidence of external pressure on defendant to pursue female victim's complaints is enough to support an inference of gender bias.[10]  Pl.'s Opp'n 21–26.

Upon review, a reasonable jury could infer anti-male gender bias from the combined force of Doe's evidence of procedural irregularities and external pressure on Hamilton to correct its perceived tolerance of sexual misconduct.

---

[10]  It also appears the Doe relies on a form of direct evidence of gender bias: a spreadsheet containing the results of Hamilton's disciplinary proceedings against its students between 2017–22. Ex. O to Miltenberg Decl. ("Pl.'s Ex. O"), Dkt. No. 58–2 at 2–4.  It is undisputed that between 2017–22, defendant found half of the male students accused of sexual misconduct responsible and that of the three female respondents, only one student was deemed responsible.  Pl.'s Opp'n at 22; Pl.'s Ex. at 2–4.  However, absent expert testimony opining on the significance of this statistical data, it is unclear how this evidence can be used to demonstrate a pattern of gender bias at the university. Further, the Second Circuit has not spoken on the use of statistical evidence like this when resolving summary judgment motions on an erroneous outcome claim.  *Cf. Doe v. Hamilton Coll.*, 2023 WL 8782020 at *27–28 (N.D.N.Y. Dec. 19, 2023) (citations omitted).  The Sixth and Tenth Circuits have analyzed similar statistical data as circumstantial evidence and determined that this kind of evidence is insufficient to create an inference of gender bias on its own.  *See Doe v. Cummins,* 662 F. App'x 437, 453 (6th Cir. 2016) (finding a sample size of nine sexual assault cases was insufficient to draw an inference of gender bias); *Doe v. Univ. of Denver*, 1 F.4th 822, 834–45 (10th Cir. 2021) ("As a general rule, we and other courts have declined to infer anti-male bias from disparities in the gender makeup of sexual-misconduct complainants and sexual-misconduct respondents.").  Therefore this evidence, even if viewed in a light most favorable to plaintiff does not tend to support an inference of gender bias.

Viewed in the light most favorable to him, Doe has identified genuine disputes of material fact as to whether there were one or more procedural irregularities during the hearing.  For instance, plaintiff points to evidence that, if credited by a jury, could support the conclusion that Hamilton appointed a biased decision maker to oversee plaintiff's disciplinary proceeding.  Pl.'s Opp'n 21–23.  After all, it is undisputed that Green previously served as an investigator in a separate sexual misconduct case in which plaintiff was a witness.  Pl.'s Opp'n at 21–23; Pl.'s Reply ¶ 64; Berryman Decl., Dkt. No. 34-2 at 57.  A reasonable jury could conclude that Green's previous interaction with plaintiff in a prior sexual misconduct investigation created a conflict of interest, and that such a conflict of interest should have barred Green from serving as the Hearing Officer according to the Policy's guarantee to provide a "fair, timely, impartial" process.  Ex. H at 21.

Doe has also identified genuine disputes of material fact as to whether Hamilton was experiencing external pressure to correct "its perceived tolerance of the sexual assault of female students[.]"  Pl.'s Opp'n at 23.  For instance, plaintiff asserts that the federal Office of Civil Rights opened an investigation into defendant "based on complaints of alleged discrimination including sexual harassment, sexual violence, and retaliation."  *Id.*  Plaintiff also points to evidence of an on-campus rally on April 19, 2019, by Hamilton's

Survivors Making Activism and Radical Transformation promoting solidarity with survivors of sexual violence. *Id.* at 24. A reasonable jury could conclude that Hamilton was aware of pressure from the federal government and from student organizations to aggressively pursue complaints of sexual misconduct against male respondents and that this "external pressure" affected its disciplinary proceedings against male students.

Upon review, Doe has marshalled sufficient evidence of gender bias to survive summary judgment. A rational jury could credit plaintiff's evidence of procedural flaws coupled with evidence of a pattern of anti-male gender bias and external pressure on Hamilton and infer that defendant's decision to expel plaintiff was motivated in part by gender bias.

To be sure, Doe has not presented strongest case of gender bias that might be found in the pages of the Federal Reporter. But the question on summary judgment is not whether plaintiff has proved his case, but whether a reasonable jury *could* return a verdict in his favor upon viewing the evidence presented in a light most favorable to him. Plaintiff's showing is sufficient to warrant a trial in this case. Accordingly, defendant's motion for summary judgment on plaintiff's erroneous outcome claim will be denied.

## B. **Breach of Contract** (Count II)

Next, Doe has asserted a breach of contract claim against Hamilton. Compl. ¶¶ 87–92. Plaintiff argues that defendant breached its implied

promise to conduct disciplinary proceedings in accordance with the Policy.

*Id.*  Defendant argues that it is entitled to summary judgment on plaintiff's

breach of contract claim because it is premised on "broad and unspecified

procedures and guidelines" rather than any specific promises between

Hamilton and plaintiff.  Def.'s Mem. at 27.

In New York, students and universities enter an implied contract when

the student accepts an offer of admission.  *Carr v. St. John's Univ.*, 231

N.Y.S.2d 410 (N.Y. App. Div.), *aff'd*, 187 N.E.2d (N.Y. 1962); *Goldberg v. Pace*

*Univ.*, 88 F.4th 204, 210 (2d Cir. 2023) (quoting *Matter of Olsson v. Bd. of*

*Higher Educ.*, 402 N.E.2d 1150 (N.Y. 1980)).  The terms of the implied

contract are found in "the university's bulletins, circulars and regulations

made available to the student."  *Goldberg*, 88 F.4th at 210 (quotation

omitted).

"To state a valid claim for breach of contract in that unique context, the

student must first identify an express promise for 'certain specified services'

in the university's relevant materials."  *Goldberg*, 88 F.4th at 210 (cleaned

up).  Courts in New York have permitted plaintiffs to bring a breach of

contract claim under these circumstances only where the plaintiff has alleged

deviations from specific internal policies—not broad statements of policy or

compliance with federal law.  *See, e.g., Doe v. Yeshiva Univ.*, --- F. Supp. 3d ---

-, 2023 WL 8236316, at *11 (S.D.N.Y. Nov. 28, 2023) (collecting cases).

Indeed, the New York Court of Appeals has long recognized the difficulty in applying contract law in this context given the "essentially fictional nature of the contract" itself.  *Tedeschi v. Wagner Coll.*, 404 N.E.2d 1302, 1305 (N.Y. 1980).  Nonetheless, the Court of Appeals has long held that "simply as a matter of essential fairness in the somewhat one-sided relationship between the institution and the individual," plaintiffs may bring a breach of contract claim against a university when it does not substantially observe a rule or guideline it has adopted in relation to suspension or expulsion.  *Id.*

Doe argues that Hamilton violated the Policy when it: (1) considered inadmissible character evidence; (2) did not conduct a fair and impartial process; (3) admitted new testimony; (4) excluded relevant evidence; and (5) failed to adhere to the preponderance of the evidence standard when it weighed the parties' evidence to reach its decision.  Pl.'s Opp'n at 26–30.

Upon review, some of these arguments are plainly insufficient to defeat summary judgment.  First, Doe's argument that Hamilton failed to adhere to the Policy's guarantee of a "fair, timely, impartial" process is precisely the kind of "broad pronouncement" that is too general to establish a specific promise by defendant.  *See Rolph*, 271 F. Supp. 3d at 406.  Second, plaintiff's arguments that defendant deviated from the Policy when it admitted

inadmissible character evidence and excluded relevant, exculpatory evidence are unsupported by the record.[11]  *See* Pl.'s Ex. H at 22, 33.

By contrast, Doe's contentions that there were not extraordinary circumstances permitting testimony from new witnesses at the hearing and that the Review Board failed to adhere to a preponderance of the evidence standard when weighting the parties' evidence are sufficient to support a breach of contract claim.  *See Rochester Inst. of Tech.*, 2024 WL 10519353, at *7 (holding that plaintiff's claim that the university breached its "obligation to apply a preponderance-of-the-evidence standard" was a specific express promise that could sustain a breach of contract claim).  The Policy makes these explicit promises.  Pl.'s Ex. H at 34–35.  Therefore, questions of fact arise when determining whether defendant breached these promises.  A reasonable jury could review the evidence presented by plaintiff and conclude that Hamilton breached sufficiently specific promises in the Policy.  Accordingly, defendant's motion for summary judgment dismissing plaintiff's breach of contract claim will be denied.

## C. __Promissory Estoppel__ (Count III)

---

[11]  The Policy provides that "the SMB Chair, Title IX Coordinator, or other appropriate person may determine that information about unrelated incidents demonstrating a pattern of behavior directly related to the alleged violation is relevant" and therefore admissible.  Pl.'s Ex. H at 22.  Plaintiff also argues that defendant deviated from the Policy when it excluded various pieces of relevant evidence.  Pl.'s Opp'n at 27.  The Policy further states "[e]xcept as otherwise expressly prohibited by this Policy, any information that the Hearing Officer determines is relevant may be considered, including hearsay, history and information indicating a pattern of behavior, and character evidence" placing this determination within Green's discretion.  Pl.'s Ex. H at 33.

Finally, Doe brings a claim for promissory estoppel against Hamilton. Compl. ¶¶ 94–98.  "In New York, claims in quasi-contract such as unjust enrichment and promissory estoppel are ordinarily precluded if a valid and enforceable written contract, even an implied contract, governs the relevant subject matter." *Goldberg*, 88 F.4th at 214 (cleaned up).  Plaintiffs may plead promissory estoppel in the alternative of a breach of contract claim where there is a "a dispute over the existence, scope, or enforceability of the putative contract." *Id.*  Upon review, this claim must be dismissed.  *See Doe v. Hobart & William Smith Colls.*, 546 F. Supp. 3d 250, 274 (W.D.N.Y. 2021) (quotation omitted) ("[I]f the court finds that a contract exists, the promissory estoppel claim must fall.").  The parties agree that an implied contract existed between them.  Def.'s Mem. at 28.  Defendant only contests whether it *breached* that implied contract.  *Id.*  Accordingly, plaintiff's promissory estoppel claims will be dismissed.

## V.  <u>CONCLUSION</u>

First, Doe's Title IX "erroneous outcome" claim warrants a trial because he has gathered sufficient evidence from which a jury could conclude that Hamilton's decision to expel him was motivated by gender bias.  Second, a jury could conclude from the same set of facts that defendant breached its implied contract with plaintiff to adhere to the disciplinary process outlined

under the Policy.  Third, because the parties do not dispute the existence of a valid implied contract, plaintiff's promissory estoppel claim fails.

Therefore, it is

ORDERED that

1.  Defendant's motion for summary judgment is GRANTED in part and DENIED in part;

2.  Defendant's motion for summary judgment on plaintiff's Title IX claim is DENIED;

3.  Defendant's motion for summary judgment on plaintiff's breach of contract claim is DENIED; and

4.  Defendant's motion for summary judgment of plaintiff's promissory estoppel claim is GRANTED.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  April 18, 2024
         Utica, New York.